# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| **KERRY KENNEDY,** | |
| **Plaintiff,** | |
| **-against-** | **Civil Action No. 1:20-CV-00882-AJT-MSN** |
| **ALAN J. DABBIERE,** | |
| **Defendant.** | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND TO DISMISS

Barbara S. Wahl, VA. Bar No. 24647
Donald B. Mitchell, Jr. (admitted *pro hac vice*)
**ARENT FOX LLP**
1717 K Street, N.W.
Washington, DC 20006-5344
202.857.6000 – Telephone
202.857.6395 – Facsimile
Barbara.Wahl@arentfox.com

**Of Counsel:**
Laurel LaMontagne
**ARENT FOX LLP**
1717 K Street, N.W.
Washington, DC 20006-5344
202.857.6000 – Telephone
202.857.6395 – Facsimile

***Attorneys for Plaintiff Kerry Kennedy***

# TABLE OF CONTENTS

I.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ............................................ 1

II.    LEGAL ARGUMENT ................................................................................ 7

    A.    Summary Judgment Should Be Granted in Plaintiff's Favor On Count I Because Defendant Has Breached the June 16, 2010 Contract ............................................ 8

        1.    The June 16, 2010 Contract Is Valid and Enforceable .............................. 8

            a.    There is No Ambiguity in the June 16, 2010 Contract .................. 8

            b.    There Is Ample Consideration for the June 16, 2020 Contract .... 10

        2.    Defendant Has Breached the June 16, 2010 Contract.............................. 11

        3.    Plaintiff Is Entitled to Specific Performance ........................................... 11

    B.    Declaratory Judgment Should Be Entered for Plaintiff on Count II Because The Urn is Personal Property and Is Not a Fixture ...................................................... 13

    C.    The Court Should Enter Judgment In Favor of Plaintiff on Defendant's Counterclaim and Dismiss his Affirmative Defenses ........................................... 19

        1.    Counterclaim Count III Must Be Dismissed Because Unclean Hands and Equitable Estoppel Are Not Causes of Action in Virginia ...................... 20

        2.    The Statute of Limitations Bars Counts I and II and Also Precludes the Parallel Defenses ................................................................................ 21

            a.    Defendant Learned of Grounds for Rescission in 2016 at the Latest ................................................................................ 22

            b.    The Statute of Limitations for Both Claims Has Run .................. 23

            c.    Similarly, Laches Bars Assertion of the First and Second Affirmative Defenses ................................................................. 25

        3.    Counterclaim Count I Must Be Dismissed Because There Was No Mutual Mistake as a Matter of Law ................................................................. 26

            a.    The Dispute Involved *Ownership* of the Urn.............................. 27

            b.    The June 16, 2010 Contract Resolved a Dispute About *Ownership* Not Provenance ................................................................. 28

        4.    Defendant's Fourth Affirmative Defense for Lack of Consideration Must Be Dismissed ....................................................................................... 30

III.    CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams Outdoor Advert. Ltd. P'ship v. Long,*
  483 S.E.2d 224 (Va. 1997)....................................................................................15

*Alston v. Commonwealth,*
  652 S.E.2d 456 (Va. 2007)....................................................................................26

*In re Alterman,*
  127 B.R. 356 (Bankr. E.D. Va. 1991) ..............................................................14, 15

*Anderson v. Liberty Lobby Inc.,*
  477 U.S. 242 (1986)............................................................................................7, 8

*Arrington v. Peoples Sec. Life Ins. Co.,*
  458 S.E.2d 289 (Va. 1995)....................................................................................25

*Baum v. Whitehorse Marine, Inc.,*
  No. L95-3647, 1996 WL 33454238 (Norfolk Cir. Ct. Dec. 26, 1996) ................9, 29

*Belcher v. Kirkwood,*
  383 S.E.2d 729 (Va. 1989)....................................................................................26

*Best Med. Int'l, Inc. v. Eckert & Zieqler Nuclitec GmbH,*
  No. 1:10-cv-617, 2011 WL 3951675 (E.D. Va. Sept. 7, 2011), *aff'd,* 505 Fed.
  App'x (4th Cir. 2013) ............................................................................................20

*Bolling v. King Coal Theatres, Inc.,*
  41 S.E.2d 59 (Va. 1947)........................................................................................27

*Bouchat v. Baltimore Ravens Football Club, Inc.,*
  346 F.3d 514 (4th Cir. 2003) .................................................................................8

*Briggs v. Watkins,*
  70 S.E. 551 (Va. 1911)..........................................................................................27

*Brown v. Kittle,*
  303 S.E.2d 864 (Va. 1983)....................................................................................21

*Brumbaugh v. Princeton Partners,*
  985 F.2d 157 (4th Cir. 1993) ................................................................................25

*C.&O. Ry. Co. v. Mosby,*
  24 S.E. 916 (Va. 1896)..........................................................................................10

*Cawley v. Hanes*,
    173 Va. 381, 4 S.E.(2d) 376 [(Va. 1939)]...........................................................10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................... 7-8

*Danville Holding Corp. v. Clement*,
    16 S.E.2d 345 (Va. 1941)....................................................................14, 15, 16, 17

*Devine v. Buki*,
    766 S.E.2d 882 (Va. 2015)...................................................................................19

*Excalibur Ins. Co. v. Speller*,
    257 S.E.2d 848 (Va. 1979)...................................................................................24

*Feeser v. Ross*,
    No. H89000087, 1991 WL 835296 (Warren Cnty. Cir. Ct. Nov. 13, 1991) ...................28, 29

*Firebaugh v. Hanback*,
    443 S.E.2d 134 (Va. 1994)...................................................................................21

*Griscom v. Childress*,
    31 S.E.2d 309 (Va. 1944)....................................................................................12

*H.P. Reynolds, Inc. v. Rish Equip. Co.*,
    No. 7515, 1971 WL 129136 (Norfolk Cir. Ct. Mar. 4, 1971) ...............................11

*Hamlet v. Hayes*,
    641 S.E.2d 115 (Va. 2007)....................................................................................8

*Heritage Disposal & Storage, L.L.C. v. VSE Corp.*,
    No. 1:15-cv-1484, 2017 WL 361547 (E.D. Va. Jan. 24, 2017) (Trenga, J.) ...........................20

*Hughes v. Foley*,
    128 S.E.2d 261 (Va. 1962)...................................................................................25

*JTH Tax, LLC, v. Shahabuddin*,
    477 F. Supp. 3d 477 (E.D. Va. 2020) ...................................................................8

*Lamar Corp. v. City of Richmond*,
    402 S.E.2d 31 (Va. 1991)....................................................................................15

*Lucy v. Zehmer*,
    84 S.E.2d 516 (Va. 1954)......................................................................................9

*Marlow v. Chesterfield Cnty. Sch. Bd.*,
    749 F. Supp. 2d 417 (E.D. Va. 2010) ....................................................................7

*Martin & Martin, Inc. v. Bradley Enters., Inc.*,
    504 S.E.2d 849 (Va. 1998) ................................................................. 8-9, 10

*McBride v. Commonwealth*,
    No. 1947-02-4, 2003 WL 21788936 (Va. Ct. App. Aug. 5, 2003) ..........................15

*Morris Oil Corp. v. Maryland Cas. Co.*,
    136 F. Supp. 63 (W.D. Va. 1955) .......................................................................26

*Mullins v. Sturgill*,
    66 S.E.2d 483 (Va. 1951)..................................................................................14

*Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*,
    662 S.E.2d 77 (Va. 2008)....................................................................................9

*Parker v. Westat, Inc.*,
    301 F. Supp. 2d 537 (E.D. Va. 2004) ..............................................................20

*Plant v. Merrifield Town Center Ltd. P'ship*,
    711 F. Supp. 2d 576 (E.D. Va. 2010) ..............................................................21

*Rayl v. Shull Enters., Inc.*,
    700 P.2d 567 (Ida. 1984)..................................................................................15

*Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*,
    507 S.E.2d 344 (Va. 1998)................................................................................24

*Rothermich v. Union Planters Nat'l Bank*,
    10 S.W.3d 610 (Mo. App. 2000) .....................................................................16

*In re Ryerson*,
    519 B.R. 275 (Bankr. D. Idaho 2014) ..............................................................15

*In re Shelton*,
    35 B.R. 505 (Bankr. E.D. Va. 1983) .................................................................14

*Silicon Image, Inc. v. Genesis Microchip, Inc.*,
    271 F. Supp. 2d 840 (E.D. Va. 2003), *aff'd*, 176 F. App'x 109 (Fed. Cir. 2006)...................10

*STB Mktg. Corp. v. Zolfaghari*,
    393 S.E.2d 394 (Va. 1990)................................................................................25

*Stuart v. Pennis*,
    22 S.E. 509 (Va. 1895)......................................................................................11

*Thompson v. Commonwealth*,
    89 S.E.2d 64 (Va. 1955).................................................................10, 11, 12, 29

*Tiger Fibers, LLC v. Aspen Specialty Ins. Co.*,
  594 F. Supp. 2d 630 (E.D. Va. 2009) (Trenga, J.) ..................................................26

*Transcon. Gas Pipe Line Corp. v. Prince William Cnty.*,
  172 S.E.2d 757 (Va. 1970) ........................................................................................15

*Tysons Toyota, Inc. v. Globe Life Ins. Co.*,
  45 F.3d 428, 1994 WL 717598 (4th Cir. 2004) ......................................................24

*United States Fire Ins. Co. v. Martin*,
  282 S.E.2d 2 (Va. 1981) ...........................................................................................15

*Va. Power Energy Mktg., Inc. v. EQT Energy, LLC*,
  No. 3:11-cv-630, 2012 WL 2905110 (E.D. Va. July 16, 2012)............................20

*Vienna Metro LLC v. Pulte Home Corp.*,
  786 F. Supp. 2d 1090 (E.D. Va. 2011) ...........................................................11, 12

*Wilson v. Holyfield*,
  313 S.E.2d 396 (Va. 1984).................................................................................... 9-10

*Winn v. Aleda Constr. Co.*,
  315 S.E.2d 193 (Va. 1984)...........................................................................................8

*Worldcom, Inc. v. Boyne*,
  68 Fed. App'x 447 (4th Cir. 2003) .........................................................................21

*Young-Allen v. Bank of Am.*,
  839 S.E.2d 897 (Va. 2020).........................................................................................19

**Statutes**

Va. Code § 8.01-243 ....................................................................................................22, 23

Va. Code § 8.01-248 ....................................................................................................22, 24

Va. Code § 8.01-249 ....................................................................................................22, 24

**Other Authorities**

36A C.J.S. Fixtures § 13 ...................................................................................................16

Fed. R. Civ. P. 56.......................................................................................................1, 7, 8

Local Rule 56………………………………………………………………….....................1

*Restatement (Second) of Contracts* § 359 (1981) .......................................................12

2 TIFFANY REAL PROP. § 607 (3d ed.) .......................................................................14

v

Pursuant to Fed. R. Civ. P. and Local Rule 56, Plaintiff Kerry Kennedy submits this Memorandum in support of her Motion for Summary Judgment. As demonstrated below, Plaintiff is entitled to judgment in her favor and against Defendant Alan Dabbiere as a matter of law on the Amended Complaint and on Defendant's Counterclaim. Pursuant to Count I, Plaintiff has fully performed on a valid and enforceable contract between the parties, but Defendant is in breach thereof, having refused to perform without legal basis. Alternatively, Plaintiff is entitled to the entry of judgment in her favor on Count II because the object at issue in the case — a large urn that was a gift to Plaintiff from her mother Ethel S. Kennedy (the "Urn") — constitutes personal property as a matter of law, and did not convey to Defendant when he purchased the real property on which it rested. Defendant's affirmative defenses and his counterclaims, which are just affirmative statements of his defenses, also fail as a matter of law. There are no material facts in dispute.

## I.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.     At all relevant times, the Urn has been located on the property known as Hickory Hill, located at 1147 Chain Bridge Road, McLean, Va. Exhibit 1 is a photograph of the Urn showing its placement in the front of the house, next to the flagpole, during the time that Plaintiff's family resided at Hickory Hill.

2.     During the Kennedy family's ownership, the Urn sat on the grass and was held in place solely by gravity, without other form of attachment. Exh. 2; Exh. 4 (Pl.'s Dep.) 36-37.



3.     Plaintiff, the seventh of Robert F. and Ethel S. Kennedy's eleven children, grew up at Hickory Hill and considered it her home. The Urn has special meaning to her, as it symbolizes her family's life together at Hickory Hill and the Kennedy family's unique history. Exh. 4 (Pl.'s Dep.) 54-55, 318-19. According to Robert Kennedy family lore (which turned out to be inaccurate), the Urn had once been located at Hammersmith Farm in Rhode Island, a childhood residence of Jacqueline Kennedy Onassis, Plaintiff's aunt. Exh. 3 (Pl.'s Interrog. Responses), at 1-2. The Urn's value is incalculable. Am. Compl. ¶¶ 33 & 39.

4.     After living at Hickory Hill for more than fifty years, in December 2009, Ethel Kennedy ("Mrs. Kennedy") sold Hickory Hill to Defendant. Mrs. Kennedy remained at Hickory Hill until May 31, 2020, when she moved out. ECF 37 (Def.'s Countercl.) ¶ 18.

5.     As part of Mrs. Kennedy's departure from Hickory Hill in 2010, the Kennedy family engaged in a process by which Mrs. Kennedy first invited her children to select three items from among her property; the remainder would be distributed among them by lots. Plaintiff selected the Urn. Exh. 4 (Pl.'s Dep.) 216-17. When Mrs. Kennedy moved out of Hickory Hill, the Urn remained there while Plaintiff made arrangements for it to be removed. Exh. 5 (6/4/10 email from A. Phalen to Defendant).

6.     A dispute arose between Plaintiff and Defendant in early June 2010 regarding ownership of the Urn. ECF 37 (Def.'s Countercl.) ¶¶ 24-28. Defendant contended that the Urn

should remain at Hickory Hill as an important part of the house's façade, and was intended to convey with the real estate. Exhs. 5 & 6 (Def.'s 6/7/10 and 6/11/10 emails). Plaintiff argued that the Urn was personal property and had been gifted to her by her mother. Lawyers for each party argued their respective positions. Exh. 7 (6/14/10 Letter from E. Zappone to D. Campbell).

7. On June 16, 2010, Plaintiff and Defendant had a telephone conversation. Defendant proposed a solution to their dispute. The Urn would be kept at Hickory Hill for a period of ten years, after which Plaintiff could take possession of it, and Defendant would acknowledge Plaintiff's ownership, and not contest ownership of the Urn. Exh. 8 (Def.'s Dep.) 209-10; Exh. 4 (Pl.'s Dep.) 259-60.

8. As part of the same June 16, 2010, telephone conversation, Defendant also requested that Plaintiff assist him in obtaining photographs from the Kennedy family collection and a painting of Hickory Hill. Plaintiff agreed to assist Defendant in obtaining these items, and she did so. Exh. 8 (Def.'s Dep.) 220; Exh. 4 (Pl.'s Dep.) 258-59.

9. After the phone call, Defendant sent an email to Plaintiff on June 16, 2010, at 7:42 p.m., that memorialized the parties' agreement (the "June 16, 2010 Contract"). Titled "Status of the Urn in front of Hickory Hill," Defendant wrote:

> Kerry, the purpose of this email is to memorize [sic] our conversation that the Urn in the front of Hickory Hill will remain as your property and we give up any rights to it conveying with the property and in exchange you agree that the Urn will stay in its current place for 10 years from today's date – June 16th, 2010. At that time you are free to take the urn. I will sign a copy of this email and send you a signed PDF via email.

Defendant signed the email with his handwritten signature, not merely an electronic signature, and sent it Plaintiff. Exh. 9.

10. Later in the evening of June 16, 2010, Defendant also notified Kennedy family assistant Anne Phelan ("Phelan") regarding the agreement reached between himself and Plaintiff.

Exh. 10 (6/16/10 email from Def. to A. Phalen).

11.    At the end of June 2010, Defendant promised Plaintiff that he would "provide proper maintenance and repairs to the urn so that it is provided to you in the same condition as it presently exists." Exh. 8 (Def.'s Dep.) 126. During the time that the Urn has been in Defendant's possession he has removed the numerous coats of white paint that protected the Urn, without Plaintiff's permission. *Id.* at 39 & 136-37.

12.    During the period 2011 through 2013, Defendant undertook extensive renovations to Hickory Hill. During the construction work, Defendant moved the Urn from its place next to the flag pole in front of the house. *Id.* at 128.

13.    In 2013, McLean resident Carole Herrick ("Herrick") began work on a book about Hickory Hill titled "Hickory Hill, McLean, Virginia, A Biography of a House and Those Who Lived There" (the "Herrick Book"). The Herrick Book was published in May 2016. *Id.* at 52-53. Defendant provided Herrick with photographs of and access to Hickory Hill in connection with the preparation of the Herrick Book. Exhibit 11 (Herrick Dep.) 10; Exh. 8 (Def.'s Dep.) 52.

14.    In connection with her work on the Herrick Book, Herrick obtained a copy of a memorandum that had been prepared by soon-to-be-confirmed Supreme Court Justice Robert Jackson in connection with his purchase of Hickory Hill in 1941 from Leo and Leonora Rocca. Exh. 11 (Herrick Dep.) 56-57 & 95. The Memorandum, dated July 3, 1941, memorialized the understanding between Jackson and the Roccas regarding certain "personal property" at Hickory Hill that would become Jackson's property as part of his purchase of Hickory Hill (the "Jackson-Rocca Personal Property Agreement"). Exh. 12. The Jackson-Rocca Personal Property Agreement states as follows:

> The following **personal property** will remain with the real estate and become the property of the purchaser:

> Lawn mower, trailer, tractor, and **lawn urn** and the following items in the house:
>
> Hall, stair, and master bedroom carpets; attic table and benches; gas stove and refrigerator in the kitchen; and the piano.

*Id.* (emphasis added).

15.    After obtaining the Jackson-Rocca Personal Property Agreement, Herrick provided a copy to Defendant some time in 2015 or 2016.  Exh. 8 (Def.'s Dep.) 55-56.

16.    The Herrick Book, as published, contains the following passage at page 79:

> On July 3, 1941, the Jacksons settled upon a purchase price of $47,950 and put down $500, promising to pay the remainder at settlement… *On this same date, they executed a contingency memorandum of understanding with the Rocca's [sic] that itemized personal property that would be left behind and would then belong to the Jacksons once settlement was finalized.*  Included were such items as the lawn mower, trailer, tractor *and large lawn urn*, plus several items in the house that included the attic table and benches, gas stove and refrigerator in the kitchen, the piano in the hall, as well as the stair and master bedroom carpets.

Exh. 13 (emphasis added).  Defendant admits he read this passage.  Exh. 8 (Def.'s Dep.) 54-55.

17.    Defendant reviewed the Herrick Book before it was published and edited some of the text.  *Id.* at 49-50.  He also read it after it was published, some parts more closely than others.  *Id*. at 52-53.

18.    On April 2, 2018, Plaintiff approached Defendant regarding obtaining early possession of the Urn, prior to her entitlement to it on June 16, 2020.  Plaintiff wrote:

> Dear Alan, Nice to hear from you. …  I've been thinking of contacting you as I recently purchased a home in Hyannis port and plan to place the cache pot in the front yard.  I know we agreed to ten years and that anniversary is in 2019 [sic]. If it makes no difference to you I'd love to fetch it earlier. At any rate I'll need to make arrangements next year. I believe you removed it during reconstruction. Any thoughts on best way to remove it again?"

Exh. 14 (4/2/18 email from Pl. to Def.).

19.    After receiving this email, Defendant immediately began engaging in efforts to obtain a replacement for the Urn.  Exh. 15 (4/3/18 email from Def. to House Manager) ("Let's

see if we can find a shop that can copy the urn. Essentially make a mold and re-cast it"); Exh. 16 (4/25/18 email from Def. to his assistant) ("Ask if they have an Urn to replace what is in front. Or some lawn sculpture of that scale."); Exh. 8 (Def.'s Dep.) 147-49, 151. On October 23, 2018, Defendant did, in fact, purchase on eBay a "monumental Urn." Exh. 17 (10/23/18 email); Exh. 8 (Def.'s Dep.) 153-55. Since its arrival at Hickory Hill, in November 2018, the replacement urn has remained in its packing crate in storage on the property. Exh. 18 (11/20/18 email from House Manager to Def.); Exh. 8 (Def.'s Dep.) 153-57.

20.    On November 5, 2018, Defendant responded to Plaintiff's April 2, 2018 request to take early possession of the Urn. Defendant stated to Plaintiff:

> *We have found a suitable replacement* below which is almost exactly the same size and I have pasted some details below. That said … we would very much like to keep the existing urn in place if we could come up with an acceptable arrangement with you. … If there is some amount of a financial consideration that would be reasonable that we would make to you or to the RFK Foundation we would be very open to that discussion.

Exh. 14 (11/5/18 email from Def. to Pl.) (emphasis added).

In a November 5, 2018 email back to Defendant, Plaintiff responded as follows:

> I understand your interest in the urn. As you can imagine, having lived with it for half a century, it has enormous sentimental value for me. When Hickory Hill was sold, my mother gave each one of her children an item of their choice from our home. The urn was the item I chose. So there is no financial compensation that can replace it for me. I will plan to fetch it in the spring.

*Id.* (11/5/18 email from Pl. to Def.).

21.    On May 15, 2020, about a month before Plaintiff was to take possession of her Urn under the parties' June 16, 2010 Contract, Phelan, on behalf of Plaintiff, contacted Defendant regarding the upcoming return of the Urn. Exh. 19 (5/15/20 email from Phelan).

22.    On May 18, 2020, Defendant responded to Plaintiff as follows:

> Dear Kerry, … 10 years ago when you reached out I had said that I felt the urn had conveyed with the property and that I felt it was an important piece of the

> history of the property that should stay here. … At that time you told me the
> story that the urn had come from Hammersmith and was a gift from your Aunt
> Jackie, and that it had great sentimental value to you due to that history. Based
> on this story I agreed to your request and we made the 10 year agreement. Since
> then I have discovered some additional pieces of information that are attached.
> I am confident the urn was in fact on the property when the house conveyed
> from the Rocca family to the Jackson family, and then on to the John Kennedy
> family. Please take a look and can we discuss this when convenient.

Exh. 20 (5/18/20 email). Attached to the email was a copy of the Jackson-Rocca Personal

Property Agreement discussed in Paragraph 14 above.

23. Plaintiff's receipt of Defendant's May 18, 2020 email was the first time that she had

any indication that the Kennedy family lore was incorrect and that the Urn had not previously

been located at Hammersmith Farm. Exh. 4 (Pl.'s Dep.) 61, 255-56. By email response to

Defendant later that same day, Plaintiff stated: "Thanks for sharing!" Exh. 21 (5/18/20 email).

24. Later that same evening, Defendant once again emailed Plaintiff:

> Thanks for the quick response Kerry. I am not sure you understood my
> message. I originally agreed to let you take the urn based on your description
> of the history that it was from Hammersmith and brought here by your Aunt
> Jackie, and that this created a very special attachment. This has turned out to
> not be the accurate history and consequently I am confident that the urn should
> stay here on the property. If you agree with my position that is great and just let
> me know, otherwise we should have a discussion about it.

*Id.* (5/18/20 email from Def. to Pl.).

## II. LEGAL ARGUMENT

Summary judgment will be granted where there remains no genuine issue of material

fact. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Marlow v.

Chesterfield Cnty. Sch. Bd.*, 749 F. Supp. 2d 417, 426 (E.D. Va. 2010). "[S]ummary judgment

is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). As the Supreme Court has held, "the

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th

Cir. 2003) (quoting *Liberty Lobby*, 447 U.S. at 247-48).

A. **SUMMARY JUDGMENT SHOULD BE GRANTED IN PLAINTIFF'S FAVOR ON COUNT I BECAUSE DEFENDANT HAS BREACHED THE JUNE 16, 2010 CONTRACT**

Under Virginia law, to prevail on a claim for breach of contract, a plaintiff must

demonstrate that (1) the parties entered into a valid agreement; (2) the defendant breached his

obligations thereunder; and (3) the plaintiff suffered damage or injury as a result. *JTH Tax, LLC,*

*v. Shahabuddin*, 477 F. Supp. 3d 477, 481 (E.D. Va. 2020); *Hamlet v. Hayes*, 641 S.E.2d 115,

117 (Va. 2007). Each of these elements is present here.

**1. The June 16, 2010 Contract Is Valid and Enforceable**

On June 16, 2010, the parties entered into a written agreement supported by

consideration. In the Contract, Defendant agreed that he would recognize that "the Urn in the

front of Hickory Hill will remain as your property," "give up any rights to it conveying with the

property," and release the Urn to Plaintiff on June 16, 2020, in exchange for Plaintiff permitting

him to keep the Urn at Hickory Hill for a period of ten years. *See* Exh. 9.

**a. There is No Ambiguity in the June 16, 2010 Contract**

There is no ambiguity as to the terms of the June 16, 2010 Contract. It states plainly that

ten years after June 16, 2010, Plaintiff would be entitled to full possession of her Urn. "Words

used by the parties are normally given their usual, ordinary, and popular meaning." *Winn v.*

*Aleda Constr. Co.*, 315 S.E.2d 193, 194-95 (Va. 1984). A court "must give effect to the

intention of the parties as expressed in the language of their contract." *Martin & Martin, Inc. v.*

*Bradley Enters., Inc.*, 504 S.E.2d 849, 851 (Va. 1998). "When a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." *Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*, 662 S.E.2d 77, 80 (Va. 2008). The ten-year deal memorialized in the June 16, 2010 Contract was proposed by Defendant as a compromise to the parties' dispute over the ownership of the Urn. Fact # 7. Defendant proposed the solution, and then once Plaintiff accepted his proposal, he memorialized it in a writing he himself drafted, downloaded, signed and sent to Plaintiff. Fact # 9.[1]

The June 16, 2010 Contract does not mention the Urn's provenance, its supposed connection to Hammersmith Farm, or either parties' personal thoughts about why they were entering into the agreement. *See* Exh. 9. Nor did Defendant mention the allegedly important Hammersmith connection of the Urn in his subsequent email to Anne Phelan. Defendant, as the drafter of the June 16, 2010 Contract, was free to add any provision about his supposed basis for proposing, and then agreeing to, the June 16, 2010 Contract's terms. But he did not do so. As such, his personal reasons for entering into the June 16, 2010 Contract did not become part of the parties' meeting of the minds. *Baum v. Whitehorse Marine, Inc.*, No. L95-3647, 1996 WL 33454238, at *4 (Norfolk Cir. Ct. Dec. 26, 1996) ("a party's subjective intent, undisclosed at the time of contracting, can never form the basis of a contract") (citing *Lucy v. Zehmer,* 84 S.E.2d 516, 522 (Va. 1954)). And "courts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein." *Wilson v. Holyfield*, 313 S.E.2d

---

[1] About three hours later, after sending Plaintiff the June 16, 2010 Contract, Defendant reported to Phelan that he and Plaintiff had reached an agreement resolving their dispute over the Urn. He reiterated: "Kerry and I have worked out the Urn. She will leave it in place for 10 years then be free to take it. Not exactly what I had hoped for but life is about compromise." Fact # 10; Exh. 10.

396, 398 (Va. 1984).[2]

**b.  There Is Ample Consideration for the June 16, 2020 Contract**

A "settlement agreement is a contract and disputes respecting a settlement agreement are resolved according to the principles applicable to contracts generally." *Silicon Image, Inc. v. Genesis Microchip, Inc.*, 271 F. Supp. 2d 840, 847 (E.D. Va. 2003), *aff'd*, 176 F. App'x 109 (Fed. Cir. 2006).  "The law favors the compromise … of disputed claims … and a settlement … ought not to be set aside except upon the most satisfactory evidence." *C.&O. Ry. Co. v. Mosby*, 24 S.E. 916, 918 (Va. 1896).

It has long been recognized under Virginia law that the comprise of a dispute, where each party agrees to forbear from asserting a claim against the other, is valuable consideration, rending their compromise agreement enforceable.  For example, in *Thompson v. Commonwealth*, 89 S.E.2d 64, 67 (Va. 1955), the Virginia Supreme Court stated:

> There is likewise no merit in the contention that … "there was no sufficient and valid consideration moving to the defendants."  In addition to the clear and definite recitals in the contract as to consideration, the contract was executed for the purpose of settling a dispute or controversy between the parties. … "A compromise usually involves an act of favor or concession by each of the parties.  The favor or concession received by one is the consideration for the favor or concession granted the other." *Cawley v. Hanes*, 173 Va. 381, 390, 4 S.E.(2d) 376 [(Va. 1939)].

In this case, the parties disputed ownership of the Urn, and in "compromise," Exh. 10, entered into the June 16, 2010 Contract under which they agreed not to pursue claims against each other.  As valuable consideration, Plaintiff agreed to allow Defendant to maintain possession of the Urn at Hickory Hill for a decade.  Defendant, in turn, agreed that "the Urn in the front of Hickory Hill will remain as your property and we give up any rights to it conveying

---

[2]  Even if there were any ambiguity in the terms of the June 16, 2010 Contract, and there is not, such ambiguity would be construed against Defendant as the drafter of the Contract. *Martin & Martin, Inc.*, 504 S.E.2d at 851 ("In the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement.").

with the property." Exh. 9. He also agreed that after June 16, 2020, Plaintiff could take possession of her Urn. Each party provided the other with valuable consideration.

### 2.    Defendant Has Breached the June 16, 2010 Contract

There is no dispute that Defendant breached the June 16, 2010 Contract. He voluntarily undertook obligations under the Contract that he proposed, drafted and signed, and has refused to perform. He has breached his promise to return the Urn. She is not "free to take the [U]rn" as Defendant promised. Exh. 9. He has breached the Contract by contesting Plaintiff's ownership of the Urn, and violated his promise that the Urn "will remain as your property." *Id.* And he has breached his obligation to "give up any rights to [the Urn] conveying with the property." *Id*.

Defendant's refusal to permit Plaintiff to take possession of her property, and his contesting of her ownership rights, each constitute a material breach of the June 16, 2010 Contract. His breaches go to the very core of the Contract.

### 3.    Plaintiff Is Entitled to Specific Performance

Plaintiff is entitled to the remedy of specific performance for Defendant's breaches. "Courts routinely grant specific performance after concluding that a defendant has breached its contractual obligations." *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1090, 1101 (E.D. Va. 2011). Specific performance for contracts involving personal property is awardable where (i) a remedy at law is inadequate and (ii) will achieve the ends of justice. *Stuart v. Pennis,* 22 S.E. 509, 510 (Va. 1895).

To determine whether a remedy at law may be inadequate, courts look to the specific circumstances at issue. For example, specific performance has been granted where damages "could not be estimated in present damages without being largely conjectural," *id.*, or "where the chattel which is the subject of the contract is unique or not purchasable in the market," *Thompson*, 89 S.E.2d at 67. *See also H.P. Reynolds, Inc. v. Rish Equip. Co.*, No. 7515, 1971 WL 129136, at

*1 (Norfolk Cir. Ct. Mar. 4, 1971) (contract to purchase crane and trade in bulldozer). "Doubts [regarding the adequacy of a legal remedy] should be resolved in favor of the granting of specific performance or injunction." *Restatement (Second) of Contracts* § 359 (1981). Because of its Kennedy family history, the Urn is undoubtedly unique and not purchasable in the market.

Second, a court should also consider whether specific performance will achieve justice between the parties. To that end, a party seeking specific performance must show that she has been able, ready, prompt, eager and willing to perform the contract. *Griscom v. Childress*, 31 S.E.2d 309, 312 (Va. 1944) (purchaser of property not entitled to specific performance where he repeatedly filed to provide purchase price for property). Where a party has partially performed under an agreement and accepted its benefits, he cannot thereafter argue that there was insufficient grounds or consideration or find other fault with the contract. *Thompson*, 89 S.E.2d at 67 ("by partially performing their obligations and by accepting the privilege of continuing to occupy the premises [defendants] may not now avoid their further obligations on the ground that there was no sufficient and valid consideration moving to them"). Similarly, a party "may not take advantage of its own breach of contract by leaving Plaintiff with no remedy at law or equity." *Vienna Metro*, 786 F. Supp. 2d at 1101.

Here, Plaintiff is entitled to a grant of specific performance; her remedy at law is inadequate. Monetary damages cannot compensate her for the loss of the Urn, which is a unique object that has enormous personal value to her as a symbol of her family's life together and the Kennedy family's unique history. Fact # 3. Its ownership by John F. Kennedy, Joseph P. Kennedy and Ethel S. Kennedy, makes it a highly personal family artifact. Exh. 4 (Pl.'s Dep.) 82-88. No monetary damage could compensate Plaintiff for the loss of the Urn, which she could not replace by purchase on the market. In contrast, Defendant already has purchased a "suitable

replacement" for the Urn, and it is available for display in lieu of the Urn.  Facts # 19 & 20.

Moreover, only the Court's award of ownership and possession of the Urn to Plaintiff will achieve justice for Defendant's breaches of the June 16, 2010 Contract.  Plaintiff has fully performed under the June 16, 2010 Contract.  Defendant concedes that Plaintiff has fully performed her part of the Contract; that she "has done everything she said she would do as part of that June 16, 2010 agreement," and that "[t]here's nothing left for her to do."  Exh. 8 (Def.'s Dep.) 219.  The equities are clearly in Plaintiff's favor.  She allowed Defendant to keep the Urn at Hickory Hill for the requisite ten-year period and allowed Defendant full enjoyment of the Urn, without interference, for the full contract period.  She even facilitated Defendant obtaining photos from her family's collection and a painting.  In contrast, Defendant has breached all of his obligations under the June 16, 2010 Contract, by refusing to allow Plaintiff to take possession of her property and refusing to acknowledge Plaintiff's ownership.  His excuse for breaching their Contract — that there was a mistake as to the provenance of the Urn — is a pretext.  Defendant knew that the Urn did not originate at Hammersmith as early as 2015, when Herrick gave him a copy of the Jackson-Rocca Personal Property Agreement.  Fact # 15.  And yet Defendant said nothing to Plaintiff for five years, continuing to enjoy the Urn, and concealing the truth about its provenance, while a "suitable replacement" sits in storage in his own garage.

For all of these reasons, Plaintiff has demonstrated that Defendant has materially breached the June 16, 2010 Contract, which is valid and enforceable, and that as a matter of law Plaintiff is entitled to a grant of specific performance for return of the Urn to her.

### B.   DECLARATORY JUDGMENT SHOULD BE ENTERED FOR PLAINTIFF ON COUNT II BECAUSE THE URN IS PERSONAL PROPERTY AND IS NOT A FIXTURE

As an alternative to summary judgment on Count I, the Court should issue a declaratory judgment in Plaintiff's favor under Count II because the Urn is personal property and not a fixture.

The determination of "whether an article used in connection with realty is to be considered a fixture or not a fixture" "must be decided according to its particular facts and circumstances." *Mullins v. Sturgill*, 66 S.E.2d 483, 486 (Va. 1951). Virginia courts look to the following "general tests" to determine the character of property:

(1) Annexation of the chattel to the realty, actual or constructive;

(2) Its adaptation to the use or purpose to which that part of the realty to which it is connected is appropriated; and

(3) The intention of the owner of the chattel to make it a permanent addition to the freehold.

*Danville Holding Corp. v. Clement*, 16 S.E.2d 345, 349 (Va. 1941). Examining these tests, the Court can reach only one conclusion — that the Urn constitutes Plaintiff's personal property.

First, "under the first test, *there must be actual or constructive annexation*." *Id.* at 349 (emphasis added); *In re Shelton*, 35 B.R. 505, 509 (Bankr. E.D. Va. 1983) ("a threshold issue is whether the debtor in fact annexed anything") (citing *Danville Holding*, 16 S.E.2d at 349). "'[A]nnexation' is '[t]he act of attaching, adding, joining, or uniting one thing to another….'" *In re Alterman*, 127 B.R. 356, 361 (Bankr. E.D. Va. 1991) (quoting *In re Shelton*, 35 B.R. at 509-10). "In its ordinary signification the term 'fixture' is expressive of the act of annexation; it necessarily implies something having a possible existence apart from realty, but which may, by annexation, be assimilated into realty…." *Mullins*, 66 S.E.2d at 487; *see also* 2 Tiffany Real Prop. § 607 (3d ed.) ("Since *annexation in some form is essential* to constitute a movable chattel a fixture, it is only when such annexation is indicated or shown to exist that the questions of the intention of the person making the annexation, the character of the article as adapted to use on that part of the realty to which it is annexed, … and the legal relation between the annexor and the landowner become factors in determining whether or not the chattel is a part of the freehold.") (emphasis added).

In every Virginia case where a fixture was found, the item was physically attached or physically connected in some fashion to the real property. *See, e.g.*, *Danville Holding*, 16 S.E.2d at 351 (machinery "securely fastened to the floor of the building"); *In re Alterman*, 127 B.R. at 361 (animal cages in veterinary hospital building "secured to the wall or to each other"); *Lamar Corp. v. City of Richmond*, 402 S.E.2d 31, 34 (Va. 1991) (billboards "supported by steel poles, three feet and five feet in diameter" with the "supporting poles" "encased in concrete slabs, … extending underground over thirteen feet"); *Adams Outdoor Advert. Ltd. P'ship v. Long*, 483 S.E.2d 224, 226 (Va. 1997) (billboards "permanently affixed to the land"); *United States Fire Ins. Co. v. Martin*, 282 S.E.2d 2, 3 (Va. 1981) (air conditioning compressors "built into the building"); *Transcon. Gas Pipe Line Corp. v. Prince William Cnty.*, 172 S.E.2d 757, 762 (Va. 1970) (gas mains "buried in the ground"). *Compare In re Ryerson*, 519 B.R. 275, 289 (Bankr. D. Idaho 2014) (holding that two "monumental bronze" sculptures "rest[ing]" on "concrete pads in the gardens outside the residence" were "personal and movable works of art, and are not fixtures");[3] *McBride v. Commonwealth*, No. 1947-02-4, 2003 WL 21788936, at *2 (Va. Ct. App. Aug. 5, 2003) (affirming that an electric air compressor was personal property when "connection to the building was merely by wires and a hose" and "was easily detached").

Like the monumental bronze sculptures resting in the gardens in *Ryerson,* the Urn was not "attach[ed], add[ed], join[ed], or unit[ed]," *In re Alterman*, 127 B.R. at 361, or otherwise connected to the land. There is no debate here that the Urn was not affixed to the real property.[4]

---

[3]    Idaho law applies the same three-part test as Virginia does under *Danville Holding. See Rayl v. Shull Enters., Inc.*, 700 P.2d 567, 570 (Ida. 1984).

[4]    Defendant admitted that he had no evidence that the Urn was physically connected to the land. Exh. 8 (Def.'s Dep.) 186 (Q. Do you have any information at all as to whether the urn was connected to whatever base it was sitting on by any physical method? A. I just have no knowledge of that.").

Plaintiff testified, "It's plain from the picture it was sitting on a block which was sitting on the ground" and that "*gravity* held it in place." Fact # 2; Exh. 4 (Pl.'s Dep.) 36-37 (emphasis added). "[I]t sits on a pedestal, and the pedestal is on a block, and the block sits *on* the grass." Exh. 4 (Pl.'s Dep.) 34 (emphasis added). And, as she observed, the sales brochures on which Defendant relies for his argument that the Urn conveyed, also say it is "a tall Edwardian urn *on* the front lawn," "not in, not attached to, not appertinent [*sic*] to, but *on*." *Id.* at 159 (emphasis added). By its nature, she testified, "a lawn urn is something that you put on your lawn and that you can take off your lawn." *Id.* at 39.

Nor can it be said that the Urn has been constructively annexed to the real property, which occurs "*when removal leaves the personal property unfit for use* so that it would not of itself and standing alone be well adapted for general use elsewhere." 36A C.J.S. Fixtures § 13 (emphasis added). The fact that the Urn "was actually removed and installed elsewhere further reinforces the conclusion that the item was not so peculiarly adapted to the realty as to constitute a fixture." *Rothermich v. Union Planters Nat'l Bank*, 10 S.W.3d 610, 617 (Mo. App. 2000).

The Urn has been moved around the property on multiple occasions, to accommodate circumstances at Hickory Hill. *See, e.g.*, Exh. 1 (showing Urn near flagpole during Kennedy period); Exh. 22 (showing the Urn on left of house during Jackson period); Exh. 23 (showing Urn in center of driveway during Dabbiere period). Defendant himself admitted that he had moved the Urn during the ten years it has been in his possession. Fact #12; Exh. 8 (Def.'s Dep.) 38 (stating he moved the Urn "[f]rom the side of the house to the center of the house") & 128 (stating he "moved it" and "took it apart" during his "redesign of Hickory Hill").

Second, the Urn was not peculiarly "adapt[ed] to the use or purpose to … that part of the realty to which it is [allegedly] connected." *Danville Holding*, 16 S.E.2d at 349. The Urn was

never "essential to the purposes for which the building is used or occupied." *Id.* At all times it has been ornamental, and not integral to any Hickory Hill structure or use. *See* Fact # 2 photo (flowers during Kennedy period); Exh. 23 (flowers during Dabbiere period). It will be equally at home at Hyannis Port, where Plaintiff resides.[5]

Third, "[t]he intention of the party making the [purported] annexation" has always been to recognize the Urn *as personal property*. *Danville Holding*, 16 S.E.2d at 349. Justice Jackson, who certainly knew the difference between personal property and real estate, characterized it as "personal property" in 1941. Exh. 12 (Jackson-Rocca Personal Property Agreement) (lawn urn included on list of "*personal property* [that] will remain with the real estate." (emphasis added)). Had Justice Jackson regarded the lawn urn as a fixture, there would have been no need for him to separately write this memorandum and refer to this piece of "*personal property*" alongside items like a lawn mower, an attic table and a piano, which are certainly not fixtures.

History confirms that subsequent owners of Hickory Hill also believed the Urn was personal property. John F. Kennedy, who bought Hickory Hill from Justice Jackson's estate, which left the Urn behind, lived there for only one year before he deeded Hickory Hill to his father, Joseph P. Kennedy, in January 1957. When John and Jacqueline Kennedy moved out, they left behind everything at Hickory Hill, including furniture, books, carpets, dishes and the Urn. Exh. 4 (Pl.'s Dep.) 87 ("when my parents moved in, Jack and Jackie had left a ton of stuff in that house"). By early February 1957, when Robert and Ethel Kennedy moved into Hickory Hill, a comprehensive inventory of the personal property at Hickory Hill was prepared to

---

[5] The fact that Defendant has procured a replacement urn of the same size and scale, reasonably similar in appearance, further demonstrates that the Urn is not a chattel uniquely adapted to the Hickory Hill property. Exh. 8 (Def.'s Dep.) 157-58. Defendant concedes that there is no "physical reason why the replacement urn cannot be put in place of the urn that's in dispute in this case." *Id.* at 161.

memorialize those items of personal property now belonging to Joseph P. Kennedy as a result of the abandonment or gift/transfer from John F. Kennedy. Exh. 24 (Kennedy inventory). The Urn is individually listed in this inventory, reaffirming the intent that this chattel be viewed as personal property. *Id*. (last page).

Moreover, as Defendant has conceded, Mrs. Ethel Kennedy would not have given the Urn to her daughter if Mrs. Kennedy intended that the Urn to convey in the real property transaction with Defendant. Exh. 8 (Def.'s Dep.) 177. In a memo from Mrs. Ethel Kennedy to her children, Mrs. Kennedy wrote: "As a result of my moving from Hickory Hill there are a number of items of *personal property* that I would like to give you." Exh. 25 (memorandum from E. Kennedy ) (emphasis added). The Urn was also specifically noted under "items of personal value from Hickory Hill" on the list of personal property items that would be gifted to the Kennedy children, Exh. 26 at EK000048, and it was specifically listed among those items gifted to Plaintiff. Exh. 27 at 5.

Before this dispute started, Defendant himself acknowledged that the Urn was an item of personal property in conversations with Kennedy family assistant Anne Phelan. According to Ms. Phelan's sworn statement, Defendant regularly expressed interest in acquiring any Kennedy family-related property that might not be moved, including books and pictures. Exh. 28 (Phelan Decl.), ¶ 5. For example, Defendant asked Phelan if he could have some large family photographs from the pool house that were going to be destroyed because they were moldy; that request was denied. *Id.* In March or April 2010, Defendant specifically asked Phelan what was going to happen to the Urn in front of the house. *Id*. ¶ 6. He told her that if the Urn became too much to move, he would be very happy if it stayed behind. *Id.* From their discussions, it was clear to Phelan that Defendant did not think he owned the Urn but instead wanted to acquire it if

it was not or could not be moved from Hickory Hill.  *Id.*  If he had thought he already owned the

Urn, there would have been no reason for him to have asked Phelan whether he could acquire it.

In light of these facts, there can be no question that the Urn is personal property and not a

fixture.  As an alternative to Count I, declaratory judgment should be entered in Plaintiff's favor

on Count II of her Amended Complaint.

### C.    THE COURT SHOULD ENTER JUDGMENT IN FAVOR OF PLAINTIFF ON DEFENDANT'S COUNTERCLAIM AND DISMISS HIS AFFIRMATIVE DEFENSES

Defendant has asserted three separate counts in a Counterclaim and four affirmative

defenses.  Notably, the three Counterclaim counts and the first three affirmative defenses are

identical.  Count I of his Counterclaim is for "Rescission (Mutual Mistake)," ECF 37 at 13-15,

while the First Affirmative Defense is for "Mutual Mistake of Fact," *id.* at 39.  Count II of his

Counterclaim is "Rescission (Fraudulent Inducement)," *id.* at 15-16, while the Second

Affirmative Defense is for "Fraud and Misrepresentation," *id.* at 39.  Count III of the

Counterclaim is for "Rescission (Uncleans Hands and Equitable Estoppel)," *id.* at 16-18, while

the Third Affirmative Defense is for "Unclean Hands and Equitable Estoppel," *id.* at 39.  The

Fourth Affirmative Defense — "Lack of Consideration," *id.* at 39 — has no parallel affirmative

claim, but it is patently without merit.  *See infra* Section II.C.4.[6]

Counterclaim Count III, "Equitable Estoppel and Unclean Hands," is not recognized as a

cause of action in Virginia, and judgment must accordingly be granted to Plaintiff, and the

---

[6]     Rescission itself is not a cause of action in Virginia.  *See, e.g.*, *Young-Allen v. Bank of Am.,* 839 S.E.2d 897, 900-01 (Va. 2020)  ("Rescission based upon a breach of contract is not a cause of action in itself, but rather a remedy. [Citing three Virginia Supreme Court cases]. 'Remedies ... do not exist in the abstract; rather, they flow from and are the consequence of some wrong.' *Devine v. Buki,* 766 S.E.2d 882 ([Va.] 2015).")  We therefore treat the alleged "Rescission" causes of action as based on the claims that Defendant alleges underlie them — respectively, Mutual Mistake (Count I), Fraudulent Inducement (Count II), and Unclean Hands / Equitable Estoppel (Count III).

corresponding affirmative defense dismissed.  *See infra* Section II.C.1.  Judgment must also be

granted on Counterclaim Counts I and II, and the parallel First and Second Affirmative Defenses,

because the statute of limitations for those claims expired at least two years before Defendant

filed them.  *See infra* Section II.C.2.  Even if the statute of limitations did not bar Defendant's

Count I "Rescission (Mutual Mistake)" claim and First Affirmative Defense, they nonetheless

fail as a matter of law because the evidence does not satisfy all the elements of a mutual mistake

claim (or the parallel affirmative defense).  *See infra* Section II.C.3.

### 1. Counterclaim Count III Must Be Dismissed Because Unclean Hands and Equitable Estoppel Are Not Causes of Action in Virginia

Plaintiff is entitled to judgment on Counterclaim Count III, titled "Rescission (Unclean

Hands and Equitable Estoppel)," because neither equitable estoppel nor unclean hands is a

cognizable cause of action in Virginia.  In Virginia, "'there is no recognized cause of action for

[equitable] estoppel,'" and the doctrine is usually asserted as a 'shield' rather than a 'sword.'"

*Va. Power Energy Mktg., Inc. v. EQT Energy, LLC*, No. 3:11-cv-630, 2012 WL 2905110, at *10

(E.D. Va. July 16, 2012) (quoting *Parker v. Westat, Inc.*, 301 F. Supp. 2d 537, 544 (E.D. Va.

2004)).  "[T]here is no affirmative cause of action for estoppel under Virginia law. ... Virginia

courts have stated that equitable estoppel usually operates as a shield rather than a sword, and

therefore does not of itself create a new right."  *Best Med. Int'l, Inc. v. Eckert & Zieqler Nuclitec

GmbH*, No. 1:10-cv-617, 2011 WL 3951675, at *3 (E.D. Va. Sept. 7, 2011), *aff'd,* 505 Fed.

App'x, 281 (4th Cir. 2013).

Similarly, it is well settled that unclean hands is an equitable defense, not a cause of

action.  *See, e.g.*, *Heritage Disposal & Storage, L.L.C. v. VSE Corp.*, No. 1:15-cv-1484, 2017

WL 361547, at *9 (E.D. Va. Jan. 24, 2017) (Trenga, J.) ("[t]he doctrine of unclean hands is an

affirmative defense") (citing *Worldcom, Inc. v. Boyne*, 68 Fed. App'x 447, 451 (4th Cir. 2003)).[7]

Moreover, the axiom that one cannot assert a defense of unclean hands if one himself has unclean hands, *Firebaugh v. Hanback,* 443 S.E.2d 134, 138 (Va. 1994), is applicable here. For a period of approximately four or five years, Defendant sat on the information about the Jackson-Rocca Personal Property Agreement, without advising Plaintiff that her understanding of the Urn's connection to Hammersmith was incorrect. He told Plaintiff about the Urn's likely provenance only in 2020 when she tried to take possession of her Urn in accord with the June 16, 2010 Contract. The five years of delay allowed Defendant to take advantage of Plaintiff's trust, and to take full advantage of her full performance of the Contract, so that he could continue to possess the Urn without challenge. Moreover, Defendant also continued to enjoy the benefits that Plaintiff and her family bestowed upon him — accepting (and failing to return) the photos and the painting that he induced Plaintiff to provide to him. Defendant even went back on his word that he would protect the Urn and maintain it in the same condition that he found it when he removed the white paint it had borne for 70 years without Plaintiff's consent. Exh. 8 (Def.'s Dep.) 136-37. Given his conduct, Defendant cannot assert a defense of unclean hands.

Judgment must be entered in favor of Plaintiff on Count III of the Counterclaim.

### 2. The Statute of Limitations Bars Counts I and II and Also Precludes the Parallel Defenses

Counterclaim Count I seeks rescission of the June 16, 2010 Contract on the basis of an alleged "mutual mistake." In Counterclaim Count II, Defendant seeks rescission because of alleged "fraudulent inducement." The statute of limitations, however, has run on both claims.

---

[7]     *See also Plant v. Merrifield Town Center Ltd. P'ship*, 711 F. Supp. 2d 576, 595 (E.D. Va. 2010) (discussing the "unclean hands defense"); *Brown v. Kittle*, 303 S.E.2d 864, 867 (Va. 1983) (describing unclean hands as a doctrine under which "a party is denied relief).

The statute of limitations for claims based on mutual mistake is two years from when the claimant learns of grounds for rescission. Va. Code §§ 8.01-248, 8.01-249. The statute of limitations for claims based upon fraudulent inducement is two years from obtaining such grounds. Va. Code §§ 8.01-243, 8.01-249. Defendant first filed his Counterclaim on October 2, 2020. Defendant learned of the grounds for both of these purported claims — that the Urn did not originate at Hammersmith — by 2015 or 2016, more than four years before he filed them.

### a. Defendant Learned of Grounds for Rescission in 2016 at the Latest

As grounds for both Counterclaim Counts I and II, Defendant asserts that in their June 16, 2010 telephone call, "Plaintiff represented … that Jacqueline Kennedy had brought the urn from Hammersmith Farm to the Hickory Hill property in or around late 1955 when she and John F. Kennedy acquired the Hickory Hill property." ECF 37 ¶¶ 50 & 63.[8] Defendant further claims that but for this alleged statement by Plaintiff, he would not have entered into the June 16, 2010 Contract. *Id.* ¶¶ 52 & 65.

In the course of her research for the Herrick Book, Herrick obtained a copy of the Jackson-Rocca Personal Property Agreement. Fact # 14. That Agreement identified the "lawn urn" as one of the items of "personal property" that would pass to the Jacksons when they purchased Hickory Hill. *Id.* Defendant admits that Herrick gave him a copy of the Jackson-Rocca Personal Property Agreement in 2015 or 2016. Exh. 8 (Def.'s Dep.) 55-56. Herrick confirms that she told Defendant about the Jackson-Rocca Personal Property Agreement, Exh. 11 (Herrick Dep.) 86, and that "anything [she] had [she] gave to him," *id.* at 10.

---

[8] While Plaintiff disputes that she represented to Defendant that the Urn came from Hammersmith Farm during the June 16, 2010 telephone call, for purposes of this aspect of Plaintiff's Summary Judgment Motion only, Plaintiff does not contest Defendant's allegations in Counterclaim ¶¶ 50 and 63.

Defendant also admits that after the Herrick Book was published in 2016, he read the book generally, Exh. 8 (Def.'s Dep.) 52-53, and *specifically read the description of the Jackson-Rocca Personal Property Agreement on page 79* of the Herrick Book, *id.* at 54-55; Exh. 13 (Herrick Book) at 79. But that is not all Defendant read in the Herrick Book. At page 104 there is a photograph of the front of Hickory Hill as it looked in 2000 with the Urn. The caption reads: "To the left *is the yard urn that Justice Jackson requested be conveyed with the sale* of the house." *See id.* at 104 (emphasis added). And at page 126 of the Herrick Book, there is a photo (right above a photo of the Dabbiere family that Defendant contributed to the book) showing the house in its present state with the Urn having been moved by Defendant to the center of the new circular driveway. The caption under that photo states as follows:

> Shown above is the newly created brick paved vehicular circle driveway in front of the house. The large landscape urn in the center was moved from a location near the front of the house not too far from the flagpole. *This is the same outdoor urn that Justice Jackson asked to be conveyed with the house when he purchased Hickory Hill in 1941.*

*Id.* at 126 (emphasis added).

### b.  The Statute of Limitations for Both Claims Has Run

Two different Virginia statutes of limitation govern the two counterclaims that Defendant asserts, and each provides for a two-year limitations period. First, the statute applicable to Count II of Defendant's Counterclaim, titled "Rescission (Fraudulent Inducement)" is two years. Va. Code § 8.01-243, provides that:

> Unless otherwise provided in this section or by other statute, … every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues.

Second, the statute applicable to Count I of Defendant's counterclaim, titled "Rescission (Mutual

Mistake)," is the general two-year statute for other claims.[9]  Va. Code § 8.01-248 provides:

> Every personal action on or after July 1, 1995, for which no limitation is otherwise prescribed, shall be brought within two years after the right to bring such action has accrued.

Under Code § 8.01-249, a cause of action based on *either* actual fraud or constructive

fraud[10] accrues when the claim is or should have been discovered:

> In actions for fraud or mistake, … and in actions for rescission of contract for undue influence, when such fraud, mistake, misrepresentation, deception, or undue influence is discovered or by the exercise of due diligence reasonably should have been discovered….

*See Excalibur Ins. Co. v. Speller*, 257 S.E.2d 848, 850 (Va. 1979) (applying § 8.01-249 to cases

of both actual fraud and constructive fraud); *Tysons Toyota, Inc. v. Globe Life Ins. Co.*, 45 F.3d

428, 1994 WL 717598, at *6 (4th Cir. 2004) (unpublished) (same).  For purposes of the accrual

of a cause of action, under Virginia law, "mutual mistake" — Defendant's Counterclaim Count I

— is treated as a type of constructive fraud.  *Excalibur Ins.*, 257 S.E.2d at 850.

Under Va. Code § 8.01-249(1), the statute of limitations for both Counterclaim Count I

and Count II accrued against Defendant "when such fraud, mistake, misrepresentation, [or]

deception … *is discovered or by the exercise of due diligence reasonably should have been

discovered*."  (Emphasis added.)  Here, Defendant *admits* that he received the Jackson-Rocca

---

[9]    *Excalibur Ins. Co. v. Speller*, 257 S.E.2d 848, 849 (Va. 1979), applied the general statute of limitations in § 8.01-248 to the mutual mistake claim in that case.  At that time, the statute was one year.  It was subsequently amended to two years.

[10]    A plaintiff asserting a cause of action for actual fraud bears the burden of proving by clear and convincing evidence that a false representation was "made intentionally and knowingly." *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 346-47 (Va. 1998).  Constructive fraud, on the other hand, requires proof, also by clear and convincing evidence, "that a false representation of a material fact was made innocently or negligently." *Id*.  Because Defendant admitted under oath that he has no evidence that Plaintiff committed actual fraud in her alleged representations about the Urn's purported Hammersmith Farm provenance in the June 16, 2010 phone call, Exh. 8 (Def.'s Dep.) 221-23, Defendant's Count II for "Fraudulent Inducement" must be analyzed as one for constructive fraud.

Personal Property Agreement in either 2015 or 2016. Fact # 15. He further *admits* that he read on page 79 of the Herrick Book that Justice Jackson had received the Urn from the Roccas in 1941, Fact # 16, and thus knew that the Urn's presence at Hickory Hill predated the Kennedys.

Defendant's [1] possession of the Jackson-Rocca Personal Property Agreement, along with [2] the text of the Herrick Book on page 79 about the Urn's connection to prior Hickory Hill owners Rocca and Jackson, as well as [3] the captions to the pictures on pages 104 and 126 of the Herrick Book, *see* Exh. 13, constituted *actual notice* that Plaintiff's alleged misrepresentations of a Hammersmith provenance were inaccurate. At the very least, these three facts put Defendant on ample and legally preclusive inquiry notice[11] that the Urn was not brought from Hammersmith Farm by Mrs. Jacqueline Kennedy.

### c. Similarly, Laches Bars Assertion of the First and Second Affirmative Defenses

Defendant's First and Second Affirmative Defenses are also both premised on the alleged mutual mistake of fact. *See* ECF 37 ¶¶ 47-59, and 60-68. Both fail on the basis of laches in light of Defendant's failure to take appropriate steps to investigate the provenance of the Urn when he learned of its pre-Kennedy history in 2015 or 2016.

---

[11] Under Virginia law, "[s]tatutes of limitations are strictly enforced and exceptions thereto are narrowly construed." *Arrington v. Peoples Sec. Life Ins. Co.*, 458 S.E.2d 289, 290 (Va. 1995). A plaintiff must use "such a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent [person] under the particular circumstances." *STB Mktg. Corp. v. Zolfaghari*, 393 S.E.2d 394, 397 (Va. 1990). Inquiry notice is triggered by evidence of the *possibility* of fraud, *not by complete exposure* of alleged scam; merely bringing suit after a scheme has been laid bare will not satisfy requirements of due diligence when there have been prior warnings that something was amiss. *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993). The burden of proof is on the plaintiff "to prove that he acted with due diligence and yet did not discover the fraud or mistake until within the statutory period of limitation immediately preceding the commencement of the action." *Hughes v. Foley*, 128 S.E.2d 261, 263 (Va. 1962). "Where the underlying facts are undisputed, the issue of whether the plaintiff has been put on inquiry notice can be decided as a matter of law." *Brumbaugh*, 985 F.2d at 162.

Just as statutes *in pari materia* must be construed in light of each other, *e.g., Alston v. Commonwealth*, 652 S.E.2d 456, 462 (Va. 2007), so Virginia law also requires that laches be applied to equitable claims or defenses when statutes of limitations on parallel claims have expired. *See Belcher v. Kirkwood*, 383 S.E.2d 729, 731 (Va. 1989) ("It is a well-established principle … that in respect to the statute of limitations equity follows the law; and if a legal demand be asserted in equity which at law is barred by statute, it is equally barred in equity."). Because Defendant knew of the grounds for assertion of a claim for rescission against Plaintiff in 2016 at the latest, he cannot now assert the same grounds as a defense.

### 3. Counterclaim Count I Must Be Dismissed Because There Was No Mutual Mistake as a Matter of Law

Even if the statute of limitations had not run on Counterclaim Count I for rescission due to alleged mutual mistake, the claim nonetheless fails *because there was no mutual mistake* as a matter of law. In order for mutual mistake to void an agreement, both contracting parties must have held the "same mistaken belief with respect to a *material* fact at the time the agreement was executed." *Tiger Fibers, LLC v. Aspen Specialty Ins. Co.*, 594 F. Supp. 2d 630, 643 (E.D. Va. 2009) (Trenga, J.) (emphasis added). Here, there was no mutual mistake, and certainly not a *material* one.

> This doctrine … *undermines the integrity and certainty of contracts*; and a court will not reform a written agreement on those grounds unless there is *clear and convincing evidence* of mutual mistake. *See, e.g., Morris Oil Corp. v. Maryland Cas. Co.*, 136 F. Supp. 63, 65 (W.D. Va. 1955) ("nothing less than evidence that is plain and convincing beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement."); [additional citations omitted]; *see also Dickenson County Bank v. Royal Exchange Assurance of London*, []160 S.E. 13, 16 ([Va.] 1931) ("the proof must be clear, convincing, satisfactory, and *such as to leave no reasonable doubt* on the mind that the writing does not correctly embody the intention of the parties"). … *Id.* (*defendant must show that "there has been a meeting of minds* — their agreement actually entered into, but the contract ... does not express what was really intended by the *parties* [plural] thereto").

*Id.* at 643-44 (emphasis added).  *See also Briggs v. Watkins*, 70 S.E. 551, 554 (Va. 1911) ("the mutual mistake [must be] made by both parties in a matter which is the cause or subject of the contract — that is, in the substance of the thing contracted for"); *Bolling v. King Coal Theatres, Inc.*, 41 S.E.2d 59, 62 (Va. 1947) ("rescission will not be granted for breach of a contract which is not of such substantial character as to defeat the object of the parties in making the contract").

Here, Defendant must show by clear and convincing evidence not only that both parties made a mistake but also that the mistake was *material* to the June 16, 2010 Contract such that there was no meeting of the minds, "defeat[ing] the object of the parties in making the contract." *Bolling*, 41 S.E.2d at 62.  Defendant bears the burden of showing that *Plaintiff* entered into the Contract because she believed that the Urn came from Hammersmith Farm and that the Urn's Hammersmith provenance was, from her point of view, "*the cause or subject of the contract*." *Briggs*, 70 S.E. at 554 (emphasis added).  The evidence, however, is directly to the contrary.

### a.  The Dispute Involved *Ownership* of the Urn

In evaluating the question of materiality and whether *Plaintiff* would have entered into the June 16, 2010 Contract had she known that the Urn predated the Kennedys at Hickory Hill, it is important to remember the context of the parties' dispute.

Mrs. Ethel Kennedy had sold Hickory Hill in December 2009, with a right to live there until the end of May 2010.  The December 2009 Purchase Agreement provided that "fixtures" went with the real estate to Defendant, but Mrs. Kennedy's personal property did not, of course, otherwise convey with the real estate.  Mrs. Kennedy then embarked on a process of distributing her personal property to her children in the Spring of 2010, first by allowing each child to choose three items from the home and property for her approval, and then by the drawing of lots for the remaining items she would not need in her new residence.  Fact # 5; Exh. 4 (Pl.'s Dep.) 217. Plaintiff selected the Urn as one of her three items.  Exh. 4 (Pl.'s Dep.) 218; Fact # 5.

When Mrs. Kennedy moved out the last weekend in May, 2010, the Urn remained there while Plaintiff made arrangements for it to be removed. Fact # 5. On June 4, 2010, Phalen emailed Defendant's wife and noted that "I still haven't had official confirmation from Kerry about the urn in front of the house. Last I heard a fellow that works with her, was coming to pick it up this week…." Exh. 5. Defendant objected, claiming that "we are confident that the intent of both parties was for it to convey as part of the sale." *Id.*; Fact # 6. After additional correspondence from Defendant on June 7 and June 11 and a telephone call between the parties on June 11, the parties' lawyers got involved. Fact # 6 and Exhs. 5, 6 and 7. Defendant's attorney advocated in a June 10 telephone call that the Urn was a fixture; Plaintiff's counsel (who had also represented Mrs. Kennedy in the sale) responded in writing that the Urn was not attached or affixed to the land in any manner and was not a fixture. Exh. 7.

The stage was set for the decisive telephone call between Plaintiff and Defendant on June 16, 2010. The parties spoke for about 30 minutes by phone the evening of June 16, 2010. Exh. 8 (Def's Dep.) 197. The parties agree that Defendant proposed a compromise — that he would keep the Urn at Hickory Hill for a period of ten years, after which Plaintiff could take possession of it, and that Defendant would not contest Plaintiff's ownership of the Urn. Facts # 7 and 9.

The June 16, 2010 Contract, which Defendant drafted, signed and emailed to Plaintiff at 7:42 p.m. on June 16, 2010, memorialized the parties' agreement about the Urn. Fact # 9; Exh. 9. It does not state that the parties were entering into the Contract on the basis of the Urn's provenance; Hammersmith Farm is not mentioned at all. *Id. See also Feeser v. Ross*, No. H89000087, 1991 WL 835296, at *2 (Warren Cnty. Cir. Ct. Nov. 13, 1991)

### b. The June 16, 2010 Contract Resolved a Dispute About *Ownership* Not Provenance

Defendant's entire mutual mistake claim rests on his allegation that he and Plaintiff

shared a mistake about the *history* of the Urn, which invalidates their Contract. *But the Contract they made on June 16 resolved an entirely different point*: who *owned* the Urn, not where it came from. Defendant had contended that he owned it because it was a fixture that conveyed under the 2009 Hickory Hill Purchase Agreement, whereas Plaintiff contended that she owned it because it was her mother's personal property that had been gifted to Plaintiff. There was no mistake about the parties' respective positions. Nor was there any mistake about the bargain that the parties had struck. The parties understood the basis for their disagreement, and there was a complete meeting of the minds as to the terms of the June 16, 2010 Contract, which was a compromise of the parties' dispute. *See* Exh. 9.

A party's motivation for entering into an agreement does not become part of the agreement unless it is included in the agreement's terms. *Baum*, 1996 WL 33454238, at *4 ("a party's subjective intent, undisclosed at the time of contracting, can never form the basis of a contract"). The *absence of mention* in the contract of the issue alleged to be material in a mutual mistake case *is evidence that the fact was not material. Feeser*, 1991 WL 835296, at *2 ("The contract in this case is wholly silent with regard to [the issue plaintiff advances as the mutual mistake] or indeed as to any condition or contingency with respect to [the issue plaintiff advances as the mutual mistake].")

Here, the Urn's alleged connection with Hammersmith Farm was not a term of the agreement, no less a material term. It was *never mentioned* in the June 16, 2010 Contract itself. The record is devoid of *any* representations about Defendant's alleged reason for entering into the Contract until his May 18, 2020 email to Plaintiff, Exh. 20 — after he had received Plaintiff's full performance under the June 16, 2010 Contract. *Thompson*, 89 S.E.2d at 67.

Plaintiff explicitly testified that the Urn's connection to Hammersmith had nothing to do

with her decision to enter into the June 16, 2010 Contract: "The driver for me to request the urn from my mother was the urn's connection to my childhood, *not the provenance* of the urn." Exh. 4 (Pl.'s Dep.) 318-19. Moreover, Defendant did not rely on the statement(s) allegedly made by Plaintiff about the Hammersmith provenance of the Urn. As he freely admitted, he'd known of the Kennedy family's belief that the Urn had come from Hammersmith since 2005, when he first saw brochures about Hickory Hill that mentioned the Urn and its connection to Hammersmith Farm. Exh. 8 (Def.'s Dep.) 250-51. Thus Plaintiff's alleged comments to him about the Urn's Hammersmith provenance "*weren't new information*" to him and were not something he had "already not heard and believed." *Id*. 206-07 (emphasis added).[12]

Because the provenance of the Urn was not material to the creation of the June 16, 2010 Contract, the Count I counterclaim for rescission due to mutual mistake fails.

### 4. Defendant's Fourth Affirmative Defense for Lack of Consideration Must Be Dismissed

For his Fourth Affirmative Defense, Defendant contends that specific performance of the June 16, 2010 Contract is unenforceable for "lack of consideration." ECF 37 at 39. This defense is both legally and factually without merit, and should be dismissed. As discussed in Section II.A.1.b, *supra*, there was more than ample consideration for the June 16, 2010 Contract.

The Fourth Affirmative Defense to the contrary should be accordingly dismissed.

## III. CONCLUSION

For the reasons set forth above, Plaintiff requests entry of judgment in her favor on Count I or II of the Amended Complaint and on Defendant's Counterclaims, and dismissal of all of Defendant's affirmative defenses.

---

[12]     To the extent that the emotionality with which Plaintiff expressed her connection to the Urn swayed Defendant, *id*., 202, 209, that also was not relevant to the question of *ownership* they were resolving, and does not constitute a mutual mistake of fact.

March 12, 2021

Respectfully submitted,

*/s/ Barbara S. Wahl*
Barbara S. Wahl, VA. Bar No. 24647
Donald B. Mitchell, Jr. (admitted *pro hac vice*)
**ARENT FOX LLP**
1717 K Street, N.W.
Washington, DC 20006-5344
202.857.6000 – Telephone
202.857.6395 – Facsimile
Barbara.Wahl@arentfox.com


**Of Counsel:**
Laurel LaMontagne
**ARENT FOX LLP**
1717 K Street, N.W.
Washington, DC 20006-5344
202.857.6000 – Telephone
202.857.6395 – Facsimile

***Attorneys for Plaintiff Kerry Kennedy***

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of March, 2021, the foregoing was served via the

Court's CM/ECF system, which will then send a notification of such filing to the following:

Benjamin L. Williams
Cozen O'Connor
1200 19th Street, NW
Washington, DC 20036
E: blwilliams@cozen.com

and

Joel D. Bush II (admitted *pro hac vice*)
Joe P. Reynolds (admitted *pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
E: jbush@kilpatricktownsend.com
E: jreynolds@kilpatricktownsend.com

*Attorneys for Defendant*

*/s/ Barbara S. Wahl*
Barbara S. Wahl, VA. Bar No. 24647
**ARENT FOX LLP**
1717 K Street, N.W.
Washington, DC 20006-5344
202.857.6000 – Telephone
202.857.6395 – Facsimile
Barbara.Wahl@arentfox.com
