IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KERRY KENNEDY,                          )
                                        )
            Plaintiff,                   )
                                        )
v.                                      )        Civil Action No. 1:20-cv-00882 (AJT/MSN)
                                        )
ALAN J. DABBIERE,                       )
                                        )
            Defendant.                   )
_____)

## <u>NOTICE OF CORRECTION</u>

The Memorandum Opinion and Order dated June 23, 2021 [Doc. No. 66] is hereby

corrected as follows, the name "the Honorable Robert J. Jackson" at [Doc. No. 66] at 3, is

corrected to "the Honorable Robert H. Jackson," as reflected in the corrected Memorandum

Opinion and Order attached hereto.

The Clerk is directed to forward copies of this Order to all counsel of record.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 9, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KERRY KENNEDY,                          )
                                        )
              Plaintiff,                 )
                                        )
v.                                      )        Civil Action No. 1:20-cv-00882 (AJT/MSN)
                                        )
ALAN J. DABBIERE,                       )
                                        )
              Defendant.                 )
_____)

## MEMORANDUM OPINION AND ORDER

Plaintiff Kerry Kennedy (the "Plaintiff" or "Kennedy") seeks to recover a large lawn urn,

with a judicial declaration that the urn is her personal property.  The urn is physically located on

the grounds of the former home of Plaintiff's father and mother, the late Senator Robert F.

Kennedy and Mrs. Ethel Skakel Kennedy ("Mrs. Kennedy"), known as Hickory Hill in McLean,

Virginia, which is currently owned by Defendant Alan J. Dabbiere (the "Defendant" or

"Dabbiere").  [Doc. No. 13] (the "Amended Complaint" or "Am. Coml.").  The parties have filed

cross motions for summary judgment [Doc. Nos. 51, 52] (collectively, the "Motions" or

"Mots.").[1]  There are no genuine issues of material fact, and for the reasons stated below,

Plaintiff is entitled to judgment as a matter of law.  Plaintiff's Motion is therefore **GRANTED**;

and Defendant's Motion is **DENIED**.

### I.    BACKGROUND

Unless stated otherwise, the following facts are undisputed:

---

[1] Plaintiff seeks summary judgment as to Counts I and II of her Amended Complaint and also on Defendant's
Counterclaim and Affirmative Defenses.  *See* [Doc. No. 52] (Plaintiff Kerry Kennedy's Motion for Summary
Judgment and to Dismiss).  Defendant seeks summary judgment as to Counts I and II of Plaintiff's Amended
Complaint.  *See* [Doc. No. 51] (Defendant's Motion for Summary Judgment).

1.   A nearly six foot tall, five foot wide ornamental lawn urn, depicted below, sits in front of Hickory Hill, in McLean, Virginia ("Hickory Hill") (the "Urn").  Am. Compl. ¶ 3; [Doc. No. 55] ("Defendant's Memorandum" or "Def.'s Mem.") at 12; [Doc. No. 53] ("Plaintiff's Memorandum" or "Pl.'s Mem.") at 3.





Am. Compl. at 3; Pl.'s Mem. 8.

2.   The Urn has been situated on the Hickory Hill property, and in front of the residence, since at least 1941. Def.'s Mem. at 12; Pl.'s Mem. 3.

3.   On July 3, 1941, the Honorable Robert H. Jackson, then nominated to the U.S. Supreme Court, signed a memorandum with Leo and Leonora Rocca, the then owners of the Hickory Hill property (the "1941 Memorandum"), which provided:

> This memorandum of understandings reached between Mr. Rocca and myself constitutes a part of the purchase agreement for the property at Langley, Virginia, known as Hickory Hill.
>
> The following *personal property* will remain with the real estate and become the property of the purchaser:
>
> Lawn mower, trailer, tractor, and *lawn urn*, and the following items in the house:
> Hall, stair, and master bedroom carpets; attic table and benches; gas stove and refrigerator in the kitchen; and the piano.
>
> While we anticipate no such event, it is understood that I have no use for the property except in event that my pending nomination is confirmed. In event of failure of confirmation, the purchase will not be effective.

[Doc. No. 55-5] at 2 (emphasis added); Def.'s Mem. at 12-13; Pl.'s Mem. 3.

4.   The "lawn urn" identified in the 1941 Memorandum is the Urn at issue in this lawsuit. Def.'s Mem. at 13; Pl.'s Mem. 3.

5.   Since the 1940s, the Hickory Hill property has conveyed in six real estate transactions:

a. Leo and Leonora Rocca conveyed the property to the Honorable Robert and Mrs. Irene Jackson by deed dated July 9, 1941;

b. The Honorable Robert and Mrs. Irene Jackson conveyed the property to the Honorable Robert Jackson individually by deed dated January 10, 1944;

c. The executors and heirs of the estate of the Honorable Robert Jackson conveyed the property to John F. Kennedy by deed dated October 15, 1955;

d. John F. Kennedy and Jacqueline B. Kennedy conveyed the property to Joseph Kennedy by deed dated January 2, 1957;

e. Joseph P. Kennedy and Rose F. Kennedy conveyed the property to Mrs. Kennedy individually by deed dated January 8, 1965; and

f. Mrs. Kennedy conveyed the property to Mr. Alan Dabbiere by deed dated December 23, 2009. Def.'s Mem. at 13-14; Pl.'s Mem. 3.

6.   During the time that Plaintiff resided at Hickory Hill, the Urn was held in place by gravity on top of grass without any other form of attachment. Def.'s Mem. at 14; Pl.'s Mem. 3,7.

7.   On or about December 17, 2009, Defendant and Mrs. Kennedy entered into a Purchase Agreement for the sale of the Hickory Hill property and the sale was finalized on December 23, 2009. Def.'s Mem. at 14-15; Pl.'s Mem. 3. Paragraph B of the Recitals to the Purchase Agreement states:

Purchaser desires to acquire such real property, and Seller desires to sell such real property, together with all right, title and interest of seller, if any, to the extent same may be appurtenant to such real property, with respect to any land lying in the bed of any existing, dedicated street, road or alley, all strips and gores adjoining thereto and all appurtenances, rights, privileges, licenses, easements, rights-of-way, covenants, development rights, tenements, or hereditaments incident thereto (collectively, the "Land"), and also including the improvements situated thereon, and all right, title and interest of Seller, in and to *those fixtures situated thereon and used in connection with such improvements (excluding however, the excluded personal property described on Exhibit F attached hereto), (such improvements and fixtures, exclusive of the excluded personal property, collectively, the "Improvements").* The Land and Improvements are hereinafter referred to as the "Property").

Def.'s Mem. at 15; [Doc. No. 55-11] at 2 (emphasis added).

8. Defendant agreed to allow Mrs. Kennedy to reside at the property after its sale through May 31, 2010. Def.'s Mem. at 7; Pl.'s Mem. 7-8; [Doc. No. 59] ("Defendant's Opposition" or "Def.'s Opp'n.") at 9.

9. Sometime between April and May of 2010, but before Mrs. Kennedy's departure from Hickory Hill on May 31, 2010, Mrs. Kennedy allowed each of her children to choose three items from Hickory Hill. Plaintiff chose the Urn as one of the three items. Def.'s Mem. at 16; Pl.'s Mem. 8.[2]

10. On June 4, 2010, shortly after Mrs. Kennedy vacated Hickory Hill, Defendant and Mrs. Kennedy's personal assistant, Anne C. Phelan ("Phelan"), exchanged emails regarding Plaintiff's retrieval of the Urn. [Doc. No. 55-13]; Def.'s Opp'n. at 4. Phelan stated that "a fellow that works with [Plaintiff], was coming to pick [the Urn] up this week . . . however, no one has called

---

[2] *See also* [Doc. No. 58-3] ("Declaration of Anne C. Phelan" or "Phelan Decl.") at 2-3 (declaration of Mrs. Kennedy's personal assistant describing the process by which Mrs. Kennedy "distribut[ed] and ma[de] gifts of her personal property . . . [to] each of her nine living children . . . includ[ing] . . . to Kerry Kennedy . . . the lawn urn at issue in this case"); [Doc. No. 53-25] at 2-3 (March 17, 2010 Memorandum to Mrs. Kennedy's children discussing the "Division of Personal Property"); [Doc. No. 58-3] at 10, 15, 19, 22 (listing "Urn/Hammersmith Farm" under "Kerry Kennedy"); [Doc. No. 53-26] at 9 (listing "Hammersmith Farm urn" under "FOR LOTS" and "Items of Personal Value from Hickory Hill"); [Doc. No. 53-27] at 6 (listing "Urn (Hammersmith Farm)" under "Kerry: LOT 3"); [Doc. No. 55-12] at 2 (May 22, 2010 email between Anne Phelan and Kerry Kennedy describing the value of the urn and cost of transporting it); [Doc. No. 53-4] and [Doc. No. 58-2] ("Kerry Kennedy Declaration" or "Pl. Decl.") at 5-21.

[Phelan] back." [Doc. No. 55-13] at 3; Def.'s Opp'n. at 4. Defendant responded that he "want[ed] to go on the record saying the urn should stay . . . and that we are confident that the intent of both parties was for it to convey as part of the sale." [Doc. No. 55-13] at 2; Def.'s Opp'n. at 4. The parties, through counsel, then exchanged a series of emails and letters discussing their respective positions on whether the Urn conveyed with Hickory Hill as a fixture. [Doc. No. 55-14] (June 14, 2010 Letter from law firm Arent Fox on behalf of Mrs. Kennedy).

11. On June 16, 2010, following a telephone conversation with Plaintiff, Defendant entered into an agreement with Plaintiff, which was communicated via email, and signed by Defendant (the "2010 Agreement"), which stated, in pertinent part:

> Kerry, the purpose of this email is to memor[ialize] our conversation that the Urn in the front of Hickory Hill will remain as your property and we give up any rights to it conveying with the property and in exchange you agree that the Urn will stay in its current place for 10 years from today's date—June 16th, 2010. At that time you are free to take the urn. I will sign a copy of this email and send you a signed PDF version via email.

Def.'s Mem. at 12; Pl.'s Mem. at 9; [Doc. No. 53-9] and [Doc. No. 55-15]; Def.'s Opp'n. at 5.

12. Following his purchase of Hickory Hill in December, 2009, Defendant from 2011 to 2013 included a circle brick paved driveway. Pl.'s Mem. at 9; [Doc. No. 53-8] at 27; [Doc. No. 53-13] at 8.

13. In 2016, Carole Herrick published the book titled "Hickory Hill, McLean, Virginia, A Biography of a House and Those Who Lived There" (the "Herrick Book"), for which Defendant had provided Herrick with photographs and access to Hickory Hill. For her part, Herrick had obtained a copy of the 1941 Memorandum, and provided a copy to Defendant sometime in 2015 or 2016. Defendant reviewed the book before it was published, editing some of its text and received and read a copy of the book after it was published. [Doc. No. 53-13]; [Doc. No. 53-11]; [Doc. No. 53-8] at 7-12, 33.

6

14. The Herrick book stated that the 1941 Memorandum "itemized personal property that would be left behind [following the sale of the property to Justice Jackson]. Included were such items as . . . [a] large lawn urn . . . ." [Doc. No. 53-13] at 6. Included in the Herrick Book on page 104 is the following photograph with the caption: "This is Hickory Hill as it looked in 2000 . . . . To the left is the yard urn that Justice Jackson requested be conveyed with the sale of the house." [Doc. No. 53-13] at 7.



*Id.* (picture on page 104).

Also included in the Herrick Book on page 126 is the following photograph with the following caption: "Shown above is the newly created brick paved vehicular circle driveway in front of the house. The large landscape urn in the center was moved from a location near the front of the house not too far from the flagpole. This is the same outdoor urn that Justice Jackson asked to be conveyed with the house when he purchased Hickory Hill in 1941." [Doc. No. 53-13] at 8.



*Id.* (picture on page 126).

15. On April 2, 2018, Plaintiff approached Defendant regarding obtaining early possession of

the Urn. Plaintiff wrote:

> Dear Alan, Nice to hear from you . . . . I've been thinking of contacting you as I recently
> purchased a home in Hyannis port and plan to place the cache pot in the front yard. I know
> we agreed to ten years and that anniversary is in 2019 [sic]. If it makes no difference to
> you I'd love to fetch it earlier. At any rate I'll need to make arrangements next year. I
> believe you removed it during reconstruction. Any thoughts on best way to remove it
> again?"

[Doc. No. 53-14] at 3-4.

16. Thereafter, between April and November 2018, Plaintiff and Defendant exchanged a

series of emails wherein Defendant discussed his efforts to replace the Urn with a replica, [Doc.

No. 53-15] at 2,[3] and his interest in developing an "acceptable arrangement . . . to keep the

---

[3] *See also* [Doc. Nos. 53-16, 53-17, 53-18] (emails discussing the purchase of a replacement for the Urn between
April and November 2018).

existing urn in place." [Doc. No. 53-14] at 2-3. Plaintiff responded that "there is no financial compensation that [could] replace [the Urn]." *Id.* at 2.

17. Then, in a letter to Plaintiff on May 18, 2020, Defendant stated:

Dear Kerry, . . . 10 years ago when you reached out I had said that I felt the urn had conveyed with the property and that I felt it was an important piece of the history of the property that should stay here . . . . At that time you told me the story that the urn had come from Hammersmith and was a gift from your Aunt Jackie, and that it had great sentimental value to you due to that history. Based on this story I agreed to your request and we made the 10 year agreement. Since then I have discovered some additional pieces of information that are attached. I am confident the urn was in fact on the property when the house conveyed from the Rocca family to the Jackson family, and then on to the John Kennedy family. Please take a look and can we discuss this when convenient.

[Doc. No. 53-20].

18. On May 19, 2020, Defendant emailed Plaintiff and stated that he

originally agreed to let [Plaintiff] take the urn based on [her] description of the history that it was from Hammersmith and brought here by your Aunt Jackie [i.e. Jacqueline Kennedy], and that this created a very special attachment . . . [t]his has turned out to not be the accurate history and consequently I am confident that the urn should stay here on the property.

[Doc. No. 53-21] at 2; *see also* Def.'s Opp'n. at 5-7.

No resolution was reached and on July 31, 2020, Plaintiff filed suit against Defendant [Doc. No. 1] based on diversity jurisdiction pursuant to 28 U.S.C. § 1332,[4] seeking, *inter alia*, specific performance of the 2010 Agreement (Count I) and a declaratory judgment that the Urn is personalty that belongs to Plaintiff (Count II). Am. Compl. at 10-12. On January 13, 2021, the Court issued an Order denying Defendant's motion to dismiss Count II for lack of jurisdiction. [Doc. No. 35]. On January 27, 2021, Defendant filed his Counterclaims, Answer, and Affirmative Defenses to Plaintiff's First Amended Complaint [Doc. No. 37] asserting counterclaims for recission of the 2010 Agreement based on mutual mistake (Counterclaim

---

[4] Both Plaintiff and Defendant agree that the Urn is valued in excess of $75,000. Am. Compl. ¶ 4; [Doc. No. 55] at 26.

Count I), fraudulent inducement (Counterclaim Count II), and unclean hands and equitable estoppel (Counterclaim Count III), together with affirmative defenses on those same grounds as well as lack of consideration. On March 12, 2021, Defendant and Plaintiff filed their respective Motions for Summary Judgment. [Doc. Nos. 51-52]. The Motions were fully briefed,[5] and a hearing was held on the Motions on April 14, 2021, following which the Court took the Motions under advisement.

## II.   LEGAL STANDARD

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, to defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of some alleged

---

[5] *See* [Doc. No. 55] ("Defendant's Memorandum" or "Def.'s Mem."); [Doc. No. 53] ("Plaintiff's Memorandum" or "Pl.'s Mem."); [Doc. No. 58] ("Plaintiff's Opposition" or "Pl.'s Opp'n."); [Doc. No. 59] ("Defendant's Opposition" or "Def.'s Opp'n."); [Doc. No. 61] ("Plaintiff's Reply" or "Pl.'s Reply."); [Doc. No. 60] ("Defendant's Reply" or "Def.'s Reply").

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

In a non-jury case such as this one, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.*, 11 F. Supp. 3d 672, 681 (E.D. La. 2013) (citing *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010) (citing *In re Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991))). "When deciding a motion for summary judgment prior to a bench trial, the district court 'has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result.'" *Id.* (quoting *In re Placid Oil Co.*, 932 F.2d at 398). "Therefore, the Court may draw inferences from the evidence before it in deciding the motion for summary judgment." *Id.* at 681 n.68 ("The district court, as the trier of fact, was permitted to draw inference from this evidence to conclude that Johnson failed to present sufficient evidence of 'reporting' a violation of law."); *see also Cincinnati Ins. Co. v. Norfolk Truck Ctr., Inc.*, 430 F. Supp. 3d 116, 119 (E.D. Va. 2019) (citing *International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003) ("It makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts. If a trial

11

on the merits will not enhance the court's ability to draw inferences and conclusions, then a

district judge properly should draw his inferences without resort to the expense of trial."

(quoting *In re Placid Oil Co.,* 932 F.2d at 398)).

## III.   ANALYSIS

Plaintiff has filed a two count First Amended Complaint asserting a claim for specific

performance of the 2010 Agreement (Count 1) and, alternatively, for a declaration that the Urn is

personal property that belongs to her.  Defendant has filed a three count counterclaim for

recission of the 2010 Agreement based on mutual mistake (Count I), fraudulent inducement

(Count II), and unclean hands and equitable estoppel (Count III).  He has also challenged the

enforceability of that contract by way of the affirmative defenses of (1) lack of consideration; (2)

mutual mistake of fact; (3) fraud and misrepresentation; and (4) unclean hands and equitable

estoppel.  Accordingly, this case revolves around the following inquiries: whether the parties

entered into an enforceable contract, namely, the 2010 Agreement; if so, whether Defendant has

established grounds for recission of that contract; and if so, whether the Urn is a fixture that

conveyed to Defendant with the sale of Hickory Hill or whether it is personalty that belongs to

the seller, i.e., to Mrs. Kennedy, as the prior owner of Hickory Hill, or the Plaintiff, as the donee

of the Urn as a gift from its owner.

As discussed below, there are no genuine issues of material facts, and as a matter of law,

the 2010 Agreement is a valid enforceable agreement, Defendant has failed to establish any

grounds for recission, and Plaintiff is entitled to specific performance.  Alternatively, were the

contract unenforceable for any reason, the Urn constitutes personal property that belongs to

Plaintiff.

**A. The 2010 Agreement is supported by adequate consideration.**

The 2010 Agreement is an enforceable agreement on its face, and Defendant does not contend otherwise.  There is also no dispute over whether Plaintiff has fully performed, whether the Defendant has breached the contract, or whether Plaintiff has suffered a cognizable damage as a result of the breach.[6]  Rather, Defendant contends that the 2010 Agreement is not enforceable because it is not supported with adequate consideration.  *See Powell v. Bank of Am., N.A.*, 2011 WL 6130806, at *2 (E.D. Va. Dec. 8, 2011) ("An enforceable contract requires mutual assent and mutual consideration.") (citing *Plaskitt v. Black Diamond Trailer Co.*, 164 S.E.2d 645, 653 (Va. 1968)).  That contention is based on the claim that "Plaintiff cannot establish that she has any valid ownership rights in the urn . . ., rendering the June 2010 Agreement unenforceable for lack of consideration." Def.'s Mem. at 30.  In that regard, Defendant contends that (1) at time he purchased Hickory Hill in December, 2009, the Urn was a fixture that conveyed to Defendant with that purchase and Mrs. Kennedy therefore never had the legal ability thereafter to transfer ownership of the Urn to Plaintiff through gifting or otherwise; and (2) even if the Urn constituted personal property, there is insufficient evidence that Mrs. Kennedy in fact gifted the Urn to Plaintiff.  Alternatively, Defendant argues that "even if Plaintiff could show valid ownership rights in the urn (which she cannot), there is no evidence of the 'absolutely essential' agreement from Plaintiff that she will forebear in her exercise of a valid legal right." *Id.* at 31.  In other words, Defendant contends that Plaintiff did not give up anything of sufficient value when she entered into the 2010 Agreement.  Whether consideration is adequate is a question of law for the court. *Veilleux v. Merrill Lynch Relocation Mgmt., Inc.*, 226 Va. 440, 446 (1983).

---

[6] Under Virginia law, to prevail on a claim for breach of contract, a plaintiff must demonstrate that (1) the parties entered into a valid agreement; (2) the defendant breached his obligations thereunder; and (3) the plaintiff suffered damage or injury as a result. *JTH Tax, LLC, v. Shahabuddin*, 477 F. Supp. 3d 477, 481 (E.D. Va. 2020); *Hamlet v. Hayes*, 641 S.E.2d 115, 117 (Va. 2007).

### 1. The Urn is personal property, not a fixture.

"In the absence of any specific agreement between the parties as to the character of a chattel placed upon the freehold, the three general tests are as follows: (1) Annexation of the chattel to the realty, actual or constructive; (2) Its adaptation to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) The intention of the owner of the chattel to make it a permanent addition to the freehold." *Ferguson v. Stokes*, 287 Va. 446, 453–54 (2014) (citing *Danville Holding Corp. v. Clement,* 178 Va. 223, 231–32 (1941)). Virginia law recognizes that "[t]he intention of the party making the annexation is the paramount and controlling consideration." *Id.* The 2010 Agreement is silent as to the character of the Urn; and the parties have not otherwise agreed.

"'[A]nnexation' is '[t]he act of attaching, adding, joining, or uniting one thing to another . . . .'" *In re Alterman*, 127 B.R. 356, 361 (Bankr. E.D. Va. 1991) (quoting *In re Shelton*, 35 B.R. 505, 509–10 (Bankr. E.D. Va. 1983) ("[A] threshold issue is whether the debtor in fact annexed anything")). "In its ordinary signification the term 'fixture' is expressive of the act of annexation; it necessarily implies something having a possible existence apart from realty, but which may, by annexation, be assimilated into realty . . . ." *Mullins v. Sturgill*, 192 Va. 653, 660 (1951). Here, it is undisputed that the Urn is not physically attached, anchored or annexed to the Hickory Hill property; there are no chains, wires, or any other attachments connecting it to the property. In fact, the Urn has been moved from time to time, including during the 10-year period Defendant has had possession of the Urn. *See* [Doc. No. 53-8] at 14 (Defendant stating in deposition testimony that he had to take the Urn apart to move it "left of the flagpole"); [Doc. No. 53-14]; [Doc. No. 53-1] (showing Urn near flagpole during Kennedy period); [Doc. No. 53-22] (showing Urn on left of house during Jackson period); [Doc. No. 53-23] (showing Urn in

center of driveway during Dabbiere period).[7]  The undisputed evidence is that the Urn has not

been physically annexed to the realty.[8]

Nor does it qualify as property "adapted to the use of the property to which [it is]

annexed, and [] essential to the purpose for which the [property was] acquired." *Transcon. Gas*

*Pipe Line Corp. v. Prince William Cnty.*, 172 S.E.2d 757, 762 (Va. 1970) (gas mains "buried in

the ground").  Although the Urn remained in one location for extended periods of time, it had

been moved from time to time, as mentioned above, and its relatively fixed location does not

under the circumstances allow any inference of specialized or adapted use relative to the land.

*See Rothermich v. Union Planters Nat'l Bank*, 10 S.W.3d 610, 617 (Mo. Ct. App. 2000) ("The

fact that the item was actually removed and installed elsewhere further reinforces the conclusion

that the item was not so peculiarly adapted to the realty as to constitute a fixture.").

---

[7] *Compare Danville Holding*, 16 S.E.2d at 351 (machinery "securely fastened to the floor of the building"); *In re Alterman*, 127 B.R. at 361 (animal cages in veterinary hospital building "secured to the wall or to each other"); *Lamar Corp. v. City of Richmond*, 402 S.E.2d 31, 34 (Va. 1991) (billboards "supported by steel poles, three feet and five feet in diameter" with the "supporting poles" "encased in concrete slabs, . . . extending underground over thirteen feet"); *Adams Outdoor Advert. Ltd. P'ship v. Long*, 483 S.E.2d 224, 226 (Va. 1997) (billboards "permanently affixed to the land"); *United States Fire Ins. Co. v. Martin*, 282 S.E.2d 2, 3 (Va. 1981) (air conditioning compressors "built into the building"); *Transcon. Gas Pipe Line Corp. v. Prince William Cnty.*, 172 S.E.2d 757, 762 (Va. 1970) (gas mains "buried in the ground") *with In re Ryerson*, 519 B.R. 275, 289 (Bankr. D. Idaho 2014) (holding that two "monumental bronze" sculptures "rest[ing]" on "concrete pads in the gardens outside the residence" were "personal and movable works of art, and are not fixtures"); *McBride v. Commonwealth*, 2003 WL 21788936, at *2 (Va. Ct. App. Aug. 5, 2003) (affirming that an electric air compressor was personal property when "connection to the building was merely by wires and a hose" and "was easily detached").

[8] In support of its position, Defendant relies on two non-Virginia cases, which are dissimilar in almost every aspect. *See* Def.'s Mem. at 22 (citing to *Snedeker v. Warring*, 12 N.Y. 170, 171 (1854) and *Oakland Cemetery Co. v. Bancroft*, 28 A. 1021, 1021 (Pa. 1894)).  In *Snedeker*, the court found the statue to be a fixture because removing it would have left an "unseemly and uncovered base" which was permanent and specifically constructed, made of the same material as the house for ornamental purposes, and removal would have caused an "objectionable deformity." 12 N.Y. at 177–78.  In *Oakland Cemetery Co.*, the court held that a cemetery monument, consisting of a stone foundation extending below ground down below the frost line, "upon [which] foundation a marble base was placed, surmounted by a marble shaft, and upon the shaft the statue in question was erected" and "[t]he whole of the structure was cemented together, and constituted a solid mass," constituted a fixture. 28 A. at 1021.  It had been specially "built by the cemetery company for the ornamentation of the grounds." *Id.*  Defendant also asserts that "many jurisdictions have concluded, in the context of fixtures law, that an object may be 'affixed to the land' solely by force of gravity." Def.'s Mem. at 22-24.  To the extent any of the cited cases stands for that proposition based on facts comparable to this case, they are inconsistent with settled Virginia law on fixtures. *See* Pl.'s Opp'n. at 16-17.

There is no evidence that anyone ever viewed the Urn as a fixture other than the Defendant, who voiced that view for the first time sometime between May and June, 2010, when Plaintiff acted to obtain possession of it. *See also supra* Section I ¶ 10; [Doc. Nos. 55-12, 55-13, 55-14]. Rather, the only evidence concerning how its owners viewed the Urn before the parties' dispute is the 1941 Memorandum between the Roccas and Justice Jackson; the 2009 Purchase Agreement between Mrs. Kennedy and Defendant, which includes Exhibit F, titled "List of Excluded Personal Property," which does not include the Urn; and Mrs. Kennedy's gifting of the Urn to Plaintiff. The 1941 Memorandum specifically lists the "lawn urn" as "personal property" that "will remain with the real estate and become the property of the purchaser." [Doc. No. 55-5] at 2; Def.'s Mem. at 12-13; Pl.'s Mem. at 10-11. The 2009 Purchase Agreement contains a list of "fixtures" that do not convey, [Doc. No. 55-11] at 35; and the Urn's absence from that list does not allow the inference that the parties considered the Urn a fixture.[9] And Mrs. Kennedy's gifting of the Urn to Plaintiff in 2010 reflects her view that the Urn did not convey with its sale to Defendant. *See also supra* Section I ¶ 9 note 2.

For all of these reasons, the Urn is personal property, not a fixture, as matter of law, and it, therefore, did not convey with Defendant's purchase of Hickory Hill, but rather remained the personal property of Mrs. Kennedy.[10]

---

[9] Defendant points to this List as a recognition by Mrs. Kennedy and Defendant that at the time he purchased Hickory Hill the Urn was a fixture and not personal property. Def's Opp'n at 24-27. That contention, however, ignores the List's purpose, the exclusion of those items that would otherwise convey as "fixtures," i.e., property attached to the house and other structures, such as the listed chandeliers, weathervane on top of a cabana, and candle sconces screwed in the wall. Pl.'s Reply at 9-10; [Doc. No. 55-11] at 35. In any event, however viewed, Exhibit F does not alter the conclusion dictated under the other *Danville* factors that the Urn is personal property as a matter of law, particularly since an intention to consider the Urn a fixture must be accompanied by an actual or constructive "annexation" to the property, something clearly lacking here. *See Danville Holding*, 16 S.E.2d at 232, 349 (stating that while "[t]he intention of the party making the annexation is [a] paramount and controlling consideration[,] . . . there must be actual or constructive annexation[]" in order to reach the issue of intent).

[10] Defendant makes the alternative argument that even if the Urn is not a fixture, it is an "improvement" to the property that conveyed with the land pursuant to the 2009 Purchase Agreement. Def.'s Mem. at 25-26. There is no merit to this argument. "The word 'improvement' is a comprehensive term, which includes in its meaning any development whereunder work is done and money expended with reference to the future benefit or enrichment of

### 2. The Plaintiff had sufficient ownership of the Urn when the parties entered into the 2010 Agreement.

Defendant contends that even if the Urn were personal property, Mrs. Kennedy never successfully gifted the Urn to Plaintiff, thereby depriving her of any legal ability to affect its disposition.

First, there is no evidence of any dispute between Plaintiff and Mrs. Kennedy over its ownership or whether the Urn was gifted to Plaintiff, as she contends. No one, other than Defendant, has claimed that Plaintiff does not own the Urn. Nevertheless, Defendant argues that there is "no evidence that Plaintiff came into the actual possession of the urn . . . [n]or was any written instrument prepared to evidence the gift or the transfer of ownership" to comply with Virginia law. Def.'s Mem. at 29. Instead, Defendant contends that the evidence only proves that Mrs. Kennedy "desired" to gift the Urn to Plaintiff. *Id.* at 9 (citing to a June 14, 2010 letter from Mrs. Kennedy's attorneys to Defendant's counsel which stated that "Mrs. Kennedy desires to give the urn to her daughter as a gift." [Doc. No. 55-14] at 3).

"[T]he common elements necessary to constitute a gift *inter vivos* are: (1) The gift must be of personal property; (2) possession of the property must be delivered at the time of the gift to the donee, or some other for him and the gift must be accepted by the donee; and (3) the title to the property must vest in the donee at the time of the gift." *Nelson v. Liggan,* 53 S.E.2d 798, 802 (Va. 1949), *adhered to on reh'g,* 56 S.E.2d 54 (1949) (internal quotation marks and citation omitted). "The delivery, however, may be actual, constructive, or symbolical, depending upon the nature of the thing given." *Gardner v. Moore's Adm'r*, 94 S.E. 162, 163 (Va. 1917). With

---

the premises." *Eppes v. Eppes*, 27 S.E.2d 164, 172 (Va. 1943). Here, the Urn is a chattel, not a "development" or an undertaking of work on the property or an "addition or other change in the structure of a building calculated to add to its useable value." *Taylor v . Wal-Mart Stores, Inc.*, 2001 WL 418740, at *1 (W.D. Va. Mar. 12, 2001) (applying *Eppes* test).

respect to constructive delivery of a gift of personal property, "it is sufficient if the donor

delivers the means of getting possession." *In re Garrett*, 45 B.R. 190, 193 (Bankr. E.D. Va.

1984). "The intention to give, manifested by the words or acts of the donor, is often the crucial

test in determining a constructive delivery." *Snidow v. First Nat'l Bank of Narrows*, 16 S.E.2d

385, 387 (Va. 1941), *set aside on other grounds sub nom.*, 18 S.E.2d 405 (Va. 1942); *see also*

*Monds v. Monds*, 68 Va. App. 674, 689 (2018) ("[A] clear and unmistakable intention on the part

of the donor to make a gift of his property is an essential requisite to a gift inter vivos. And this

intention must be inconsistent with any other theory.") (internal quotations and citation omitted).

Moreover, "[t]here are many things of which actual, manual tradition cannot be made, *either*

*from their nature or their situation at the time*. It is not the intention of the law to take from the

owner the power of giving these. It merely requires that he shall do what, under the

circumstances, will in reason be considered equivalent to an actual delivery." *Snidow*, 16 S.E.2d

at 387 (quoting *Elam v. Keen*, 31 Va. 333, 335 (1833)) (emphasis added); *see also Payne v.*

*Payne*, 104 S.E. 712, 716 (Va. 1920) ("There was a delivery if there was the intention to deliver

which is effectuated by words or acts, and this is a question of fact to be gathered from all of the

circumstances of the particular case.").

   While it is debatable who bears the burden of proof with respect to the status of

Plaintiff's ownership of the Urn,[11] the evidence is undisputed that Mrs. Kennedy intended to gift

---

[11] *Compare Miller v. Buck*, 271 F. Supp. 822, 828 (W.D. Va. 1967) ("The court also pointed out that, though the burden of proof is normally upon claimant to prove the gift by clear and convincing evidence, when the owner of a safe-deposit box and his donee execute a contract or lease which recites that the property therein is the joint property of the lessees, with right of survivorship, and recites that the lessees acknowledge the receipt of two keys to said box—this creates a prima facie case of a valid inter vivos gift of a joint interest (with right of survivorship) in said property. Existence of such a contract, then, shifts the burden of proof to the party contesting the gift.") (internal citations omitted) *with In re Garrett*, 45 B.R. at 192 ("With respect to the burden of proof of establishing a sufficient delivery, it is settled in Virginia that the one claiming the validity of the gift has the burden of proof to establish by clear and convincing evidence all the facts and circumstances which would show that the gift was, in fact, a valid one.").

the Urn to Plaintiff, she confirmed to Plaintiff and others her decision to gift the Urn to Plaintiff, she took all steps necessary to deliver that gift, including authorizing Plaintiff to take actual possession, and given the "situation," Plaintiff took all necessary steps to take actual possession, frustrated in that effort only by the Defendant's last minute decision to challenge her right to possession. In that regard, it is undisputed that sometime between April and May of 2010, but before Mrs. Kennedy's departure from Hickory Hill on May 31, 2010, Mrs. Kennedy allowed each of her children to choose three items from Hickory Hill and Plaintiff chose the Urn as one of the three items; that on June 4, 2010, shortly after Mrs. Kennedy vacated Hickory Hill, Plaintiff made arrangements to obtain possession of the Urn; Defendant and Mrs. Kennedy's personal assistant, Anne C. Phelan exchanged emails with respect to Plaintiff's obtaining possession of the Urn; Defendant subsequently objected, and as a result, Plaintiff did not take possession of the Urn.

Here, "the crucial test in determining a constructive delivery" has been satisfied since the evidence is undisputed that Mrs. Kennedy "manifested [her intention] [f]or the gift to be complete [to Plaintiff] by the words or act of [Mrs. Kennedy]," *Snidow*, 16 S.E.2d at 385–87; timely arrangements were made for Plaintiff to take actual possession, which did not occur for reasons beyond their control. In short, Mrs. Kennedy and Plaintiff had done all that was necessary and "manual tradition [could not] be made, either from their nature or their situation at the time." *Snidow*, 16 S.E.2d at 387. They therefore did "what, under the circumstances, will in reason be considered equivalent to an actual delivery." *Id.* (quoting *Elam*, 31 Va. at 335) (emphasis added).

Under all the undisputed facts and circumstances, Plaintiff constructively possessed the Urn, its gift to her was completed as matter of law, and Defendant effectively recognized

19

Plaintiff's status as the owner through gift of the Urn when the parties entered in the 2010

Agreement on June 16, 2010, resolving their dispute over the Urn.

### 3. Plaintiff's agreement to postpone her possession of the Urn constituted adequate consideration to support the 2010 Agreement.

Both parties agree that "a promise to forbear the exercise of a legal right is adequate

consideration to support a contract." *Greenwood Assocs., Inc. v. Crestar Bank*, 448 S.E.2d 399,

402 (Va. 1994); *see also Thompson v. Commonwealth*, 89 S.E.2d 64, 67 (Va. 1955).  Prior to

reaching the June 16, 2010 Agreement, the parties disputed whether the Urn constituted a fixture.

[Doc. No. 55-14].  To resolve that dispute, the parties entered into an agreement whereby

Defendant would be permitted to hold the Urn for ten years and upon expiration, he would return

it to Plaintiff.  *See C.&O. Ry. Co. v. Mosby*, 24 S.E. 916, 918 (Va. 1896) ("The law favors the

compromise . . . of disputed claims . . . and a settlement . . . ought not to be set aside except upon

the most satisfactory evidence.").  As such, the "compromise [] involve[d] an act of favor or

concession by each of the parties.  The favor or concession received by one is the consideration

for the favor or concession granted the other." *Thompson*, 89 S.E.2d at 67 (citing *Cawley v.*

*Hanes*, 173 Va. 381, 390 (1939)).  Because she reasonably claimed that she had the legal right to

immediate possession of the Urn, her forbearance of that legal right constituted adequate

consideration to support the 2010 Agreement, which compromised and settled the parties'

conflicting claims to the Urn.

### B. Plaintiff's request for specific performance is not precluded based on the doctrines of unclean hands or equitable estoppel.

Based on Plaintiff's misrepresentation concerning the Urn's origin, Defendant has

alleged that Plaintiff is prevented from obtaining the equitable remedy of specific performance of

the 2010 Agreement under the doctrines of unclean hands and equitable estoppel.

A party is precluded from obtaining relief on an equitable claim under the doctrine of unclean hands if the party "has been 'guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.'" *Worldcom, Inc. v. Boyne*, 68 F. App'x 447, 451 (4th Cir. 2003) (quoting *Richards v. Musselman*, 267 S.E.2d 164, 166 n.1 (Va. 1980)); *see Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1084 (E.D. Va. 2011) ("Unclean hands prevents a party from obtaining equitable relief because of that party's own inequitable conduct.") (*citing Brown v. Kittle*, 303 S.E.2d 864, 867 (Va. 1983)). "[A] defendant raising an unclean hands defense must demonstrate a close nexus between a party's unethical conduct and the transactions on which that party seeks relief." *Worldcom, Inc.*, 68 F. App'x at 451 (internal quotation marks omitted).

Here, it is undisputed that Plaintiff did not know at the time she entered into the 2010 Agreement that the Urn had not come from Hammersmith; and there is no evidence that she otherwise acted unfairly or inequitably. [Doc. No. 53-8] at 40; *see also id.* at 41 (Defendant stating, "I was not implying [that what Plaintiff said about the Urn] was untrue or intentionally untrue."); *id.* at 40 (Defendant stating that he had "no reason to suspect that [Plaintiff] knew that [the Urn] had not come from Hammersmith."); *id.* at 36 (testimony of Defendant confirming that he had the Urn for 10 years and that Plaintiff had done everything she said she would do as part of that June 16, 2010 agreement, and that there was nothing left for her to do.). Second, for the reasons stated *infra* in connection with Defendant's fraud and mutual mistake claims, there was not a "close nexus between a party's [alleged] unethical conduct and the transactions on which that party seeks relief." *Worldcom, Inc.*, 68 F. App'x at 451 (internal quotation marks omitted).

Based on undisputed facts, Plaintiff is therefore entitled to judgment as a matter of law on Defendant's assertion of the doctrine of unclean hands.[12]  Likewise, as to equitable estoppel.

Courts have used equitable estoppel as a remedy to enjoin a party whose action induced reliance by another from unfairly benefiting from the relying party's change in position.  *Emp'rs Commercial Union Ins. Co. of Am. v. Great Am. Ins. Co.*, 214 Va. 410 (1973).  However, there is no affirmative cause of action for estoppel under Virginia law.  *Parker v. Westat, Inc.*, 301 F.Supp.2d 537, 544 (E.D. Va. 2004).  Equitable estoppel usually operates as a shield rather than a sword, and therefore does not of itself create a new right.  *Id.* (citing *Meriweather Mowing Serv., Inc. v. St. Anne's-Belfield, Inc.*, 51 Va. Cir. 517 (2000)).  When equitable estoppel is applicable, a party must show (1) a representation; (2) reasonable reliance on the representation; (3) a change of position; and (4) resulting harm.  *Waynesboro Vill. LLC v. BMC Props.*, 496 S.E.2d 64, 68 (Va. 1998).

Again, for the reasons discussed *infra* in connection with Defendant's rescission claims, the origin of the Urn had nothing to do with whether the Urn was personalty or a fixture and any representation as to its origins was not material to the subject matter of the dispute being compromised in the 2010 Agreement.  Plaintiff's realization that her previous understanding as to the Urn's origins was incorrect did not inflict any cognizable harm on the Defendant, as Plaintiff's "change in position" did not interfere with Defendant's obtaining the full benefit of his bargain, which he in fact received.  Based on the undisputed facts, Plaintiff is entitled to judgment as a matter of law on Defendant's equitable estoppel defense.  *See Smith v. Sam's E.*,

---

[12] Alternatively, Plaintiff contends that Defendant cannot assert a defense of unclean hands because he himself has unclean hands based on his concealment for four to five years of the 1941 Memorandum—stating that the Urn was "personal property"—and because Defendant "went back on his word that he would protect the Urn and maintain it in the same condition that he found it."  Pl.'s Mem. at 27.  Given that Plaintiff was not guilty of unclean hands as a matter of law, there is no need to consider this alternative position.

*Inc.*, 2016 WL 3189293, at *5 (W.D. Va. June 7, 2016), *aff'd*, 672 F. App'x 311 (4th Cir. 2017) (the party asserting the defense of equitable estoppel "bears the burden of proving these elements by 'clear, precise and unequivocal evidence.'" (citing *Cowan v. Psychiatric Assocs., Ltd.*, 387 S.E.2d 747, 749 (Va. 1990))).

### C. Defendant is not entitled to rescission based on fraudulent inducement or mutual mistake either as a separate cause of action or as an affirmative defense.

Defendant seeks relief from the 2010 Agreement based on mutual mistake and fraudulent inducement, asserted as separate causes of action for recission in Counts I and II of his counterclaim and also as affirmative defenses in his Answer. Plaintiff is entitled to judgment as a matter of law on these claims, either as separate causes of action or as affirmative defenses.[13]

### 1. Defendant's rescission claims in Counts I and II based on mutual mistake and fraudulent inducement are barred by the doctrine of laches.

Defendant's rescission claims based on fraudulent inducement and mutual mistake are equitable in nature, rather than legal claims, and are therefore subject to dismissal under the doctrine of laches. Defendant's obligation to act with respect to such rescission claims has been summarized as follows:

> An application to rescind a contract should be made with due diligence, for prompt action is essential when one believes himself entitled to the rescission of his contract . . . . Where a suit based on fraud is not for damages but seeks to rescind a writing or impose a trust or other equitable relief, it is not a common-law action for fraud but is equitable in nature. Consequently, the doctrine of laches is applicable rather than any specific statute of limitations. Relief will *not be granted to one who has been guilty of inexcusable delay in asserting the right*. He will be held to have waived the objection and will be conclusively bound by the contact as if the ground of rescission did not exist.

---

[13] Defendant has also asserted in Count III of his Counterclaim a cause of action for rescission based on unclean hands and equitable estoppel. Neither unclean hands nor equitable estoppel is a cause of action, but rather an affirmative defense to Plaintiff's request for specific performance of the 2010 Agreement, as to which Plaintiff is entitled to judgment as a matter of law. *See supra* Section III(B).

16 Michie's Jurisprudence of Virginia and West Virginia, Rescission, Cancellation, and

Reformation § 7 (2010) (emphasis added, collecting cases, and internal citations omitted). As

the Fourth Circuit recognized in *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990):

> Laches is one of the affirmative defenses generally allowable under [Federal Rule of Civil
> Procedure] 8(c), although it is properly relevant only where the claims presented may be
> characterized as equitable, rather than legal . . . . Laches imposes on the defendant the
> ultimate burden of proving '(1) lack of diligence by the party against whom the defense is
> asserted, and (2) prejudice to the party asserting the defense.' The first element of laches—
> lack of diligence—exists where 'the plaintiff delayed inexcusably or unreasonably in filing
> suit.' An inexcusable or unreasonable delay may occur only after the plaintiff discovers or
> with reasonable diligence could have discovered the facts giving rise to his cause of action.
> The defendant may show lack of diligence either by proof that the action was not
> commenced within the period provided by the applicable statute of limitations or by facts
> otherwise indicating a lack of vigilance.

> 909 F.2d at 102 (collecting cases).

 In Virginia, the statute of limitations for claims based on mutual mistake or fraud is two years

from when the claimant learns of the grounds for rescission. Va. Code §§ 8.01-248 ("Every

personal action accruing on or after July 1, 1995 . . . shall be brought within 2 years after the

right to bring such action has accrued."); Va. Code §§ 8.01- 8.01-249 (actions in fraud or mistake

"shall be deemed to accrue when  such fraud [or] mistake . . . is discovered or by the exercise of

due diligence reasonably should have been discovered"); *see Hughes v. Foley*, 128 S.E.2d 261,

263 (Va. 1962) (the burden of proof is on the claimant "to prove that he acted with due diligence

and yet did not discover the fraud or mistake until within the statutory period of limitation

immediately preceding the commencement of the action").

Defendant entered into the 2010 Agreement on June 14, 2010.  Defendant first asserted

his rescission claim when he filed his Counterclaim, Answer and Affirmative Defenses on

January 27, 2021 and raised the issue of the Urn's origins to the Plaintiff for the first time on

May 18, 2020.  The uncontested record shows that  Defendant received information that

objectively raised a question concerning the origin of the Urn no later than 2015 or 2016 when

he received the 1941 Memorandum, which listed the Urn as personal property that would remain

at Hickory Hill after its sale to Justice Jackson, and the Herrick book, which had photographs

identifying the Urn as the urn on the property when it was sold to Justice Jackson. However, he

said nothing to Plaintiff about what he had learned until May, 2010, after she had fully

performed, Defendant had received the full benefit from their contract and she sought to retrieve

the Urn, as she was entitled to under the 2010 Agreement.[14]  Indeed, he said nothing during the

parties' discussions between April and November, 2018 about Plaintiff's interest in an early

retrieval of the Urn,  Defendant's efforts to replace the Urn with a replica, and Defendant's

interest in finding an "acceptable arrangement . . . to keep the existing urn in place."  [Doc. No.

53-14] at 2-3.

Defendant contends that he  was "not sure" or "did not have confidence" in 2015 that the

urn pictured on the property in 1941 was in fact the Urn that Plaintiff represented as coming

from Hammersmith, and that it wasn't until 2020 when he received another photo of the Urn

from a historian of the property that he concluded that the Urn had been on the property since at

least 1941.  Def.'s Opp'n at 23; [Doc. No. 61-1] at 4.  Whatever Defendant's subjective beliefs

as to the conclusiveness of the information he had received in 2015 and 2016 about the Urn's

origins, that information objectively placed Defendant on notice that the Urn likely did not come

---

[14] In a letter to Plaintiff on May 18, 2020, Defendant stated:
   Dear Kerry, . . . 10 years ago when you reached out I had said that I felt the urn had conveyed with the property and that I felt it was an important piece of the history of the property that should stay here . . . .  At that time you told me the story that the urn had come from Hammersmith and was a gift from your Aunt Jackie, and that it had great sentimental value to you due to that history. Based on this story I agreed to your request and we made the 10 year agreement.  Since then I have discovered some additional pieces of information that are attached.  I am confident the urn was in fact on the property when the house conveyed from the Rocca family to the Jackson family, and then on to the John Kennedy family.  Please take a look and can we discuss this when convenient.
[Doc. No. 53-20].

from Hammersmith; and he offers no reasons why in light of those concerns he delayed any investigation for five or six years.

Based on the undisputed facts and circumstances presented, Defendant engaged in inexcusable delay and a lack of due diligence, as a matter of law, in asserting any right of rescission with respect to the 2010 Agreement; and as a result, Plaintiff has been prejudiced in her ability to be restored to the status quo ante[15] or obtain possession of the Urn for over a year from when she was entitled to regain possession. Defendant is therefore barred from asserting his rescission claim in either Counts I and II of his Counterclaim.[16]

### 2. The 2010 Agreement was not based on mutual mistake.

Defendant claims that Plaintiff "persuad[ed] Defendant to relinquish his ownership of the urn as the purchaser of Hickory Hill, [by] represent[ing] that (i) the urn was a family heirloom of her aunt Jacqueline Kennedy and (ii) the urn had been brought to Hickory Hill when Mr. and Mrs. John F. Kennedy purchased it in 1955." Def.'s Opp'n at 15. Based on that contention, Defendant claims that the parties entered the 2010 Agreement based on a mutual mistake of fact, namely, that the Urn was moved to Hickory Hill from Hammersmith. *Id.*

---

[15] *See* 16 Michie's Jurisprudence of Virginia and West Virginia, Rescission, Cancellation, and Reformation § 16 (2010) ("[A person demanding rescission of a contract must restore or offer to restore the other party that which he may have received under the contract."). Given that Defendant has received the full benefit of his bargain, it would be difficult to restore to Plaintiff over ten years of lost possession and enjoyment of the Urn, were the 2010 Agreement rescinded. *Id.* ("Equity is always reluctant to rescind unless the parties can be put in status quo.").
[16] To the extent that any contrary inferences could reasonably have been drawn by a fact finder, the Court, in its limited discretion in this non-jury case, would find, based on the same evidence that would be presented at trial, that Defendant is barred under the doctrine of laches from asserting his rescission claims in Counts I and II. *See Cincinnati Ins. Co.*, 430 F. Supp. 3d at 119 (citing *International Bancorp, LLC*, 329 F.3d at 362 ("It makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts. If a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should draw his inferences without resort to the expense of trial." (quoting *In re Placid Oil Co.*, 932 F.2d at 398)).

A mutual mistake of fact gives rise in equity to a right of rescission. *Hensley v. Dreyer*, 247 Va. 25, 30 (1994). But "the mutual mistake [must be] in a matter *which is the cause or subject of the contract*—that is, *in the substance of the thing* contracted for[,]" *Briggs v. Watkins,* 70 S.E. 551, 554 (Va. 1911) (emphasis added). *See also Jennings v. Jennings*, 12 Va. App. 1187, 1192 (1991) ("The mistake may be common to both parties to a transaction, and may consist either in the expression of their agreement, or in some matter inducing or influencing the agreement, or in some matter to which the agreement is to be applied. Nothing is more clear in equity than the doctrine that a contract founded in mutual mistake of the facts *constituting the very basis or essence of it* will avoid it.") (emphasis added and quoting *Briggs,* 70 S.E. at 554); *McCarthy v. Bayliss, Chry.*, 1987 WL 488700, *2 (Va. Cir. Ct. Aug. 19, 1987) ("[T]he mistake must be material to the transaction, affecting the very substance of it and not merely incidental matter"); *Holderby v. Harvey C. Taylor Co.*, 104 S.E. 550, 552 (W.Va. 1920) ("It is not permitted for a casual, technical, or unimportant breach or failure of performance, but only for a breach so substantial as to tend to defeat the very object of the contract, and in practically all cases of rescission it is held that restoration of the status quo is an essential prerequisite to the right to rescind.") (cited by *Bolling v. King Coal Theatres, Inc.*, 41 S.E.2d 59, 62 (Va. 1947)). Moreover, "[t]o prove a mutual mistake, the challenging party, . . . bears a high degree of proof." *Tiger Fibers, LLC v. Aspen Specialty Ins. Co.*, 594 F. Supp. 2d 630, 644 (E.D. Va. 2009) (stating that the challenging party "must show that 'there has been a meeting of minds—their agreement actually entered into, but the contract . . . does not express what was really intended by the parties thereto'" (citing *to Dickenson Cty. Bank v. Royal Exch. Assur. of London, England*, 157 Va. 94, 103 (1931))).

Nothing in the 2010 Agreement states why or for what reasons the agreement was made. *See Baum v. Whitehorse Marine, Inc.*, 46 Va. Cir. 527 (1996) ("[A] party's subjective intent, undisclosed at the time of contracting, can never form the basis of contract"). There is no contention that the 2010 Agreement did not state accurately what the parties agreed to or intended; and Plaintiff's statement as to the Urn's provenance had nothing to do with whether the Urn was personal property or a fixture. Nor does Defendant challenge the truth of Plaintiff's overall point that the Urn had sentimental value to the Plaintiff because of its association with her family and her growing up at Hickory Hill.

Nor is there any evidence that somehow Defendant's enjoyment of the Urn during the ten year period he was entitled to retain the Urn had anything to do with where it came from originally. In short, the alleged mutual mistake had nothing to do with the substance of the contractual bargain and did not affect the performance of that contract. *See McCarthy*, 1987 WL 488700, *2. Plaintiff has fully performed, as Defendant expected, and Defendant continued to receive and enjoy the full benefits of precisely what he bargained for, even after he learned that the Urn had not been brought by the Kennedy family to Hickory Hill.

For all these reasons, Plaintiff is entitled to judgment as a matter of law on Defendant's recission claim based on mutual mistake.

### 3. Defendant was not fraudulently induced into entering the 2010 Agreement.

Defendant next seeks recission of the 2010 Agreement on the grounds that he was fraudulently induced into the 2010 Agreement by Plaintiff's misrepresentation as to the Urn's origins. To prevail on a claim of fraud in the inducement under Virginia law, a party must prove by clear and convincing evidence a (1) false representation of material fact; (2) made intentionally, in the case of actual fraud, or negligently or innocently, in the case of constructive

28

fraud; (3) reliance and detriment; and (4) inducement to enter the contract. *Ly v. Tran*, No. 2017

WL 4002721, at *7 (E.D. Va. Aug. 23, 2017), r*eport and recommendation adopted sub nom. Yen*

*Kin Ly v. Dung Quoc Tran*, 2017 WL 3981432 (E.D. Va. Sept. 11, 2017) (citing *Murphy v.*

*Capella Educ. Co.*, 589 F. App'x 646, 652 (4th Cir. 2014)).

As discussed above, Defendant has conceded that there is no evidence that Plaintiff knew

that the Urn had come from Hammersmith and has based his fraudulent inducement claim solely

on constructive fraud, which requires only that Plaintiff's statement was false and material. *See*

*Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (under Virginia law

the fraud exists when the misrepresentation was made negligently or innocently). While the

evidence is that it was false, for essentially the same reasons stated with respect to Defendant's

mutual mistake defense, Plaintiff's misstatement as to the Urn's origins were not material to the

2010 Agreement. It had nothing to do with whether the Urn was personalty or a fixture and had

nothing to do with Defendant's ability to receive precisely what he had bargained for.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons, it is hereby

ORDERED that Defendant Alan J. Dabbiere's Motion for Summary Judgment [Doc. No.

51] be, and the same hereby is, **DENIED**; it is further

ORDERED that Plaintiff's Motion for Summary Judgment and to Dismiss [Doc. No. 52]

be, and the same hereby is, **GRANTED;** and it is further

ORDERED that that judgment be, and the same hereby is, **ENTERED** in favor of

Plaintiff as to Counts I and II of the Amended Complaint and also Counts I, II, and III of

Defendant's Counterclaim; and it is further

ORDERED that the Urn is declared the Plaintiff's personal property, and not a fixture that conveyed to Defendant with the sale of Hickory Hill, and that Defendant specifically perform in accordance with the 2010 Agreement by delivering the Urn to Plaintiff's possession in accordance with arrangements to be made by the Plaintiff at her expense.

The Clerk is directed to forward a copy of this Order to all counsel of record and enter judgment pursuant to Fed. R. Civ. P. 58 in accordance with this Order.

_____/s/_____
Anthony J. Trenga
United States District Court

Alexandria, Virginia
June 23, 2021

30